970 A.2d 1108

The INSURANCE FEDERATION OF PENNSYLVANIA, INC.; The Managed Care Association of Pennsylvania; Aetna Health, Inc.; Healthassurance Pennsylvania, Inc.; Independence Blue Cross; Magellan Behavioral Health, Inc.; and Valueoptions, Inc.,

v.

COMMONWEALTH of Pennsylvania, INSURANCE DEPARTMENT,

Appeal of the Insurance Federation of Pennsylvania.

Supreme Court of Pennsylvania.

Argued May 14, 2008.

Decided May 27, 2009.

Jayson R. Wolfgang, Paul Kevin Brobson, Buchanan Ingersoll & Rooney, P.C., Harrisburg, for Ins. Federation of Pennsylvania, appellant.

Amy Griffith Daubert, PA Dept. of Ins., Arthur F. McNulty, Ins. Dept., Office of Chief Counsel, Thomas Devlin, Alexis Leslie Barbieri, Timothy Eugene Gates, John G. Knorr, III, Office of Atty. Gen., Harrisburg, for Ins. Dept., appellee.

Gregory Buchwald Heller, Young Ricchiuti Caldwell & Heller, L.L.C., Philadelphia, for Pennsylvania Dist. Attys. Ass'n; Cty. Commiss Assoc.; PA Assoc. of D&A; PA C&Y Admin.;

PA Juv. Prob. Off.; PA Assoc. Student Assist., appellee amici curiae.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD and McCAFFERY, JJ.

### OPINION ANNOUNCING THE JUDGMENT OF THE COURT

Justice McCAFFERY.

The Insurance Federation of Pennsylvania ("the Federation") appeals from the order of the Commonwealth Court declaring that, by statute, group health insurers must provide specified minimum coverage for alcohol and drug abuse treatment once an insured receives a certification and a referral for treatment from a licensed physician or a licensed psychologist.[1] The issue presented is whether the statutory mandate precludes the application of utilization review for medical necessity and appropriateness of the mandated treatment. We conclude that managed care plans may not apply utilization review to abrogate or alter the sole statutory prerequisites to obtaining treatment for alcohol and drug abuse, i.e., certification and referral by a licensed physician or licensed psychologist. Accordingly, we affirm the order of the Commonwealth Court.

The facts of the instant case are not in dispute, and are centered on two statutes and a Notice issued by the Pennsylvania Insurance Department ("the Department") interpreting those statutes. Specifically, in 1989, the General Assembly passed Act 106, 40 P.S. §§ 908–1—908–8, which requires group health insurers to include specified minimum coverage for treatment of drug and alcohol abuse and dependency. Subsequently, in 1998, the General Assembly passed Act 68, 40 P.S. §§ 991.2101—991.2193,[2] a consumer-protection statute

1. Sections 601–A—608–A of the Insurance Company Law of 1921, Act of May 17, 1921, P.L. 682, added by Section 10 of the Act of June 11, 1986, P.L. 226, as amended by Section 8 of the Act of Dec. 22, 1989, P.L. 755.

2. Sections 2101–2194 of the Insurance Company Law of 1921, Act of May 17, 1921, P.L. 682, added primarily by Section 1 of the Act of June 17, 1998, P.L. 464.

that sets forth the responsibilities of and requirements pertaining to managed care plans in the delivery of health care services.

The Notice in question, which the Department issued in August 2003, addressed the obligations of insurers to provide coverage for drug and alcohol abuse treatment under Act 106 and concluded that Act 68 does not alter Act 106's requirements. *See* Drug and Alcohol Use and Dependency Coverage; Notice 2003–06, 33 Pa. Bull. 4041–42 (August 9, 2003) ("the Notice"). The Notice in its entirety reads as follows:

### Drug and Alcohol Use and Dependency Coverage; Notice 2003–06

This notice is issued to advise all entities subject to Act 106 of 1989 (act) (40 P.S. §§ 908–1—908–8) of their obligations under Commonwealth law in the provision of coverage for alcohol or other drug abuse and dependency benefits. The act requires specific coverage of drug and alcohol treatment services in certain group insurance policies or contracts. Drug and alcohol use and dependency are recognized in this Commonwealth as public health problems with serious workplace, health care, community and criminal justice ramifications. The Insurance Department (Department) releases the following guidance concerning the provision of benefits under the act.

The act specifies that all group policies, contracts and certificates subject to the act providing hospital or medical/surgical coverage shall include within that coverage certain benefits for alcohol or other drug abuse and dependency. Under the act, the **only lawful prerequisite** before an insured obtains non-hospital residential and outpatient coverage for alcohol and drug dependency treatment is a **certification and referral from a licensed physician or licensed psychologist.** It is the Department's determination that the same prerequisite applies for inpatient detoxification coverage. The **certification and referral** in all instances **controls both the nature and duration of treatment.** The location of treatment is subject to the insuring

entity's requirements regarding the use of participating providers.

Act 68 of 1998 (40 P.S. §§ 991.2101–991.2193), governing quality health care accountability and protection, does not change the requirements under [Act 106] and should be read in conjunction with these existing requirements. Thus, **an entity subject to Act 68 may utilize precertification or utilization reviews, provided, however, that the decision of the precertification or utilization review does not limit [Act 106] certification and referral** by the licensed physician or licensed psychologist.

Questions regarding this notice should be addressed to Ronald A. Gallagher, Jr., P.E., Deputy Commissioner, Office of Consumer and Producer Services, Insurance Department. . . .

*Id.* (emphasis added).

Following publication of the Notice, the Federation and other trade associations, insurers, and managed care plans challenged the Department's interpretation of Act 106 as applied to managed care plans by filing a petition for review in the nature of a complaint for declaratory judgment addressed to the Commonwealth Court's original jurisdiction. The petitioners, including the Federation, sought, *inter alia,* a declaration that Act 106 did not preclude, limit, or regulate the application of utilization review for medical necessity and appropriateness[3] by managed care providers. It was the petitioners' view that the General Assembly had not intended to exempt Act 106's mandated benefits from the managed care practice of utilization review for medical necessity and appropriateness, but rather had intended that utilization review be incorporated into Act 106's statutory scheme.

Agreeing that the issue presented was solely a legal one, the petitioners and the Department filed cross-motions for judg-

---

**3.** "Utilization review" is defined in Act 68 as follows: "A system of prospective, concurrent or retrospective utilization review performed by a utilization review entity of the medical necessity and appropriateness of health care services prescribed, provided or proposed to be provided to an enrollee." 40 P.S. § 991.2102.

ment on the pleadings. Following oral argument before a three-judge panel and then an *en banc* panel, the Commonwealth Court concluded that the controversy was not ripe and therefore declined to exercise jurisdiction. The Federation and the Managed Care Association of Pennsylvania appealed to this Court, which on February 21, 2006, vacated the Commonwealth Court order and remanded for a consideration of the merits of the declaratory judgment action. *Insurance Federation of Pennsylvania, Inc. v. Commonwealth of Pennsylvania, Insurance Department,* 586 Pa. 268, 893 A.2d 69 (2006) (*per curiam* order).[4]

Following oral argument on the merits, a unanimous en banc panel of the Commonwealth Court granted the Department's motion for judgment on the pleadings, denied the Federation's motion for judgment on the pleadings, and dismissed the petition with prejudice. *Insurance Federation of Pennsylvania, Inc. v. Commonwealth of Pennsylvania, Insurance Department,* 929 A.2d 1243 (Pa.Cmwlth.2007) (*en banc*). The Commonwealth Court concluded that the Department's interpretation of Act 106, as set forth by the Notice, was logical, rational, and consistent with legislative intent. *Id.* at 1250. More specifically, the Commonwealth Court determined that Act 106 plainly and clearly mandates coverage of the specified drug and alcohol abuse treatment once an insured has received a certification and a referral by a licensed physician or licensed psychologist. *Id.* at 1250–51, 1252. In agreement with the Department, the Commonwealth Court expressly concluded that the General Assembly did not intend for a managed care plan to have authority to overrule the certification and referral by a licensed physician or psychologist. *Id.* at 1251.

The Federation has now appealed to this Court for review of the Commonwealth Court's order, raising the following four issues:

---

4. In vacating and remanding by *per curiam* order, this Court cited *Arsenal Coal Co. v. Department of Environmental Resources,* 505 Pa. 198, 477 A.2d 1333 (1984), in which this Court addressed the propriety of invoking the Commonwealth Court's original jurisdiction to obtain pre-enforcement review.

1. Whether, in the absence of any supporting express statutory language or other indicia of legislative intent, it is legal error to conclude that the General Assembly intended to prohibit managed care plans ("MCPS") from applying managed care princip[les] in the delivery of Act 106 mandated benefits for alcohol and other drug abuse and dependency?

2. Whether an interpretation of Act 106 that prohibits any management of the delivery of Act 106 benefits by MCPs is against the public interest of ensuring the cost-effective delivery of quality health care benefits?

3. Whether the Commonwealth Court erred by affording deference to an administrative agency's interpretation that is offered to justify the agency's position in litigation or in interpretive rules or statements of policy?

4. Whether the Insurance Department's Drug and Alcohol Use and Dependency Coverage, Notice 2003–06, 33 Pa. Bull. 4041 (Aug. 9, 2003) is more than a mere "press release" or statement of policy and should have been promulgated as a regulation?

Federation's Brief at 5.

We will address the Federation's issues in turn, but initially we note our standard and scope of review when considering the grant of a motion for judgment on the pleadings. "A motion for judgment on the pleadings will be granted where, on the facts averred, the law says with certainty that no recovery is possible." *In re Weidner*, 595 Pa. 263, 938 A.2d 354, 358 (2007) (citation omitted). Because the question presented is a legal one, our scope of review is plenary. *Id.*

The Federation's first issue requires interpretation of a statute, which is a question of law. *Tritt v. Cortes*, 578 Pa. 317, 851 A.2d 903, 905 (2004). Accordingly, we must be guided by the Statutory Construction Act of 1972, 1 Pa.C.S. §§ 1501–91, the relevant principles of which we have recently described as follows:

The goal of statutory interpretation is to ascertain and effectuate the intent of the Legislature. 1 Pa.C.S.

§ 1921(a). The best indication of legislative intent is the language used in the statute. When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit. 1 Pa.C.S. § 1921(b). We look beyond the language employed by the General Assembly only when the words are not explicit. 1 Pa.C.S. § 1921(c).

*Commonwealth of Pennsylvania, Office of Administration v. Pennsylvania Labor Relations Board,* 591 Pa. 176, 916 A.2d 541, 547–48 (2007).

In determining legislative intent, we must read all sections of a statute "together and in conjunction with each other," construing them "with reference to the entire statute" and giving effect to all the statutory provisions. *Housing Authority of the County of Chester v. Pennsylvania State Civil Service Commission,* 556 Pa. 621, 730 A.2d 935, 945 (1999); 1 Pa.C.S. § 1921(a).

When the words of a statute are not explicit, our determination of legislative intent may be informed by other factors, including administrative interpretations of the statute, the consequences of a particular interpretation, and analysis of other statutes addressing the same or similar subjects. *Colville v. Allegheny County Retirement Board,* 592 Pa. 433, 926 A.2d 424, 432 (2007) (citing 1 Pa.C.S. § 1921(c)). We emphasize that while "an interpretation of a statute by those charged with its administration and enforcement is entitled to deference, such consideration most appropriately pertains to circumstances in which the provision is not explicit or is ambiguous." *Tritt, supra* at 905 (internal citation omitted).

If possible, we avoid a reading that would lead to a conflict between different statutes or between individual parts of a statute. *Housing Authority of the County of Chester, supra* at 946. Finally, we presume that when enacting any statute, the General Assembly intended to favor the public interest as against any private interest. 1 Pa.C.S. § 1922(5); *Vitac Corporation v. Workers' Compensation Appeal Board (Rozanc),* 578 Pa. 574, 854 A.2d 481, 485 (2004).

■■ The principal statute at issue in the instant case is Act 106 of 1989, which requires group health insurers to include, in their policies offered to subscribers, specified minimum coverage for treatment of drug and alcohol abuse and dependency:

All group health ... insurance policies ... and all group subscriber contracts ... **shall ... include within the coverage those benefits for alcohol or other drug abuse and dependency** as provided in sections [–3, –4, and –5].

40 P.S. § 908–2.

The specific benefits mandated by Act 106 fall into three categories: (1) inpatient detoxification; (2) non-hospital residential alcohol or other drug services; and (3) outpatient alcohol or other drug services. *See* 40 P.S. §§ 908–3, –4, and –5, reproduced in relevant part below:

### § 908–3. Inpatient detoxification

(a) Inpatient detoxification as a covered benefit under this article shall be provided either in a hospital or in an inpatient non-hospital facility which has a written affiliation agreement with a hospital ..., meets minimum standards for client-to-staff ratios and staff qualifications ... and is licensed as an alcoholism and/or drug addiction treatment program.

(b) The following services shall be covered under inpatient detoxification:

(1) Lodging and dietary services.

(2) Physician, psychologist, nurse, certified addictions counselor and trained staff services.

(3) Diagnostic X-ray.

(4) Psychiatric, psychological and medical laboratory testing.

(5) Drugs, medicines, equipment use and supplies.

(c) Treatment under this section may be subject to a lifetime limit, for any covered individual, of four admissions for detoxification and reimbursement per admission may be limited to seven (7) days of treatment or an equivalent amount.

40 P.S. § 908–3. "Detoxification" is defined in the statute as follows.

> **"Detoxification."** The process whereby an alcohol-intoxicated or drug-intoxicated or alcohol-dependent or drug-dependent person is assisted, in a facility licensed by the Department of Health, through the period of time necessary to eliminate, by metabolic or other means, the intoxicating alcohol or other drugs, alcohol and other drug dependency factors or alcohol in combination with drugs **as determined by a licensed physician,** while keeping the physiological risk to the patient at a minimum.

40 P.S. § 908–1 (emphasis added).

> **§ 908–4. Non–hospital residential alcohol or other drug services**
>
> (a) Minimal additional treatment as a covered benefit under this article shall be provided in a facility which meets minimum standards for client-to-staff ratios and staff qualifications ... and is appropriately licensed by the Department of Health as an alcoholism or drug addiction treatment program. **Before an insured may qualify to receive benefits under this section, a licensed physician or licensed psychologist must certify the insured as a person suffering from alcohol or other drug abuse or dependency and refer the insured for the appropriate treatment.**
>
> (b) The following services shall be covered under this section:
>
> (1) Lodging and dietary services.
>
> (2) Physician, psychologist, nurse, certified addictions counselor and trained staff services.
>
> (3) Rehabilitation therapy and counseling.
>
> (4) Family counseling and intervention.
>
> (5) Psychiatric, psychological and medical laboratory tests.
>
> (6) Drugs, medicines, equipment use and supplies.
>
> (c) The treatment under this section shall be covered, as required by this act, for a minimum of thirty (30) days per year for residential care. Additional days shall be available as provided in section [908–5(d)]. Treatment may be sub-

ject to a lifetime limit, for any covered individual, of ninety (90) days.

40 P.S. § 908–4 (emphasis added).

### § 908–5. Outpatient alcohol or other drug services

(a) Minimal additional treatment as a covered benefit under this article shall be provided in a facility appropriately licensed by the Department of Health as an alcoholism or drug addiction treatment program. **Before an insured may qualify to receive benefits under this section, a licensed physician or licensed psychologist must certify the insured as a person suffering from alcohol or other drug abuse or dependency and refer the insured for the appropriate treatment.**

(b) The following services shall be covered under this section:

(1) Physician, psychologist, nurse, certified addictions counselor and trained staff services.

(2) Rehabilitation therapy and counseling.

(3) Family counseling and intervention.

(4) Psychiatric, psychological and medical laboratory tests.

(5) Drugs, medicines, equipment use and supplies.

(c) Treatment under this section shall be covered as required by this act for a minimum of thirty outpatient, full-session visits or equivalent partial visits per year. Treatment may be subject to a lifetime limit, for any covered individual, of one hundred and twenty outpatient, full-session visits or equivalent partial visits.

(d) In addition, treatment under this section shall be covered as required by this act for a minimum of thirty separate sessions of outpatient or partial hospitalization services per year, which may be exchanged on a two-to-one basis to secure up to fifteen additional non-hospital, residential alcohol treatment days.

40 P.S. § 908–5 (emphasis added).

The Federation does not dispute that managed care plans are subject to the provisions of Act 106. However, as stated

by the Federation, "the question at the heart of this case is whether Act 106 prohibits [managed care plans] from reviewing the physician's or psychologist's medical necessity determination" prior to providing treatment for drug and alcohol abuse as mandated by the Act. Federation's Brief at 20–21.

The Federation invokes Act 68, 40 P.S. §§ 991.2102–991.2194, to support its contention. The consumer-protective nature of Act 68 has been properly recognized by the Commonwealth Court, see *Insurance Federation of Pennsylvania*, 929 A.2d at 1246, and is emphasized by the statutory description of its scope, which is the governance of "quality health care accountability and protection." 40 P.S. § 991.2101.

As defined in Act 68, a "managed care plan" is characterized by, *inter alia*, the use of a gatekeeper to manage the insured's use of health care services:

> A health care plan that **uses a gatekeeper to manage the utilization of health care services;** integrates the financing and delivery of health care services to enrollees by arrangements with health care providers selected to participate on the basis of specific standards; and provides financial incentives for enrollees to use the participating health care providers in accordance with procedures established by the plan . . . . .

40 P.S. § 991.2102 (emphasis added).

The Federation also points out that the definition of "health care service" in Act 68 includes behavioral health:

> "Health care service." Any covered treatment, admission, procedure, medical supplies and equipment or other services, **including behavioral health,** prescribed or otherwise provided or proposed to be provided by a health care provider to an enrollee under a managed care plan contract.

*Id.* (emphasis added). The Federation asserts, without challenge, that "behavioral health," as the term is used in the "health care industry," includes drug and alcohol abuse and dependency. Federation's Brief at 26.

Based on the above-quoted provisions of Act 68, the Federation argues that all the practices and procedures of managed

care plans, most particularly utilization review for medical necessity and appropriateness, should be directly applicable to and superimposable upon the certification and referral process set forth by the General Assembly in Act 106. The Department's position, in contrast, is that under Act 106, "the only lawful prerequisite before an insured obtains ... coverage for alcohol and drug dependency treatment is a certification and referral from a licensed physician or licensed psychologist." Notice, 33 Pa. Bull. at 4042. After careful analysis of the statutory text of Act 106, we conclude that the Department has correctly interpreted the Act, as we explain in detail immediately below.

Managed care plans are a well-established mechanism for delivering health care in this Commonwealth, but they do not lie outside the purview of the General Assembly's continuing judgments as to the most efficient and most effective policies and practices with respect to the delivery of health care services. The Federation does not dispute this general point.[5] However, the Federation does argue that, because Act 106 does not expressly proscribe the application of utilization review for medical necessity and appropriateness, managed care plans may apply utilization review in the context of Act 106 and may decline to provide treatment that does not satisfy the managed care plan's utilization review criteria. While it is true that the text of Act 106 does not include the terms "medical necessity" or "utilization review," we cannot agree with the Federation's assertion that "Act 106 is simply **silent** as to who makes the ultimate and controlling 'medical necessity' determination with respect to the benefits actually delivered to the insured and paid for by the insurer." Federation's Brief at 28 (emphasis added).

Contrary to the Federation's assertion, the text of Sections 908–4 and 908–5 specifies that both the authority to determine that an insured is suffering from alcohol or drug abuse/dependency, as well as the authority to refer the insured for appropriate treatment, are entrusted to a licensed physician or

---

**5.** *See* text *infra,* discussion of 40 P.S. § 764d, "Mastectomy and breast cancer reconstruction."

licensed psychologist. Specifically, the relevant text is as follows:

> Before an insured may qualify to receive benefits under this section, a **licensed physician or licensed psychologist must certify** the insured as a person suffering from alcohol or other drug abuse or dependency **and refer** the insured for the appropriate treatment.

40 P.S. §§ 908-4 and -5 (emphasis added).

As the above-quoted sentence makes clear, Sections 908-4 and -5 expressly provide for a two-part procedure to be completed by a licensed physician or psychologist before an insured can receive non-hospital residential or outpatient alcohol or drug services: (1) a certification that the insured is suffering from alcohol or drug abuse or dependency; and (2) a referral for appropriate treatment. Nothing in Sections 908-4 and 908-5 implies or suggests that managed care plans may superimpose an additional, potentially overriding review process, such as utilization review for medical necessity and appropriateness, once a licensed professional has made the explicitly required certification and referral. We will not read an additional step into Sections 908-4 and 908-5—a step that would have the potential to weaken if not effectively eliminate the mandatory language of Act 106.

Based on our analysis of the statutory text of Act 106, we also conclude, in agreement with the Department, that "[t]he certification and referral in all instances controls both the nature and duration of treatment." Notice, 33 Pa. Bull. at 4042. Any other interpretation of the plain text of the Act would render hollow the express statutory grant of authority to a licensed physician (or a psychologist in some cases) to certify and to refer the insured for "appropriate treatment." 40 P.S. §§ 908-4 and 908-5. For example, if a physician certifies an insured as suffering from drug or alcohol abuse/dependency and refers the insured for **residential** treatment services, the statute does not permit the insurer to conclude that **outpatient** treatment services would be adequate and could be substituted, based on utilization review or other criteria. Likewise, in another illustrative example, if the

referring physician determines that the "appropriate treatment" for an insured requires seven days of services, then the insurer cannot conclude that one day of services is adequate based on utilization review. These examples are of course not exhaustive, but are provided merely to make clear the general principle that the certification and referral of an insured under Act 106 are not subject to utilization review for medical necessity and appropriateness.

In contrast to Sections 908–4 and 908–5, Section 908–3, which describes the mandatory inpatient detoxification benefits, does not include a provision regarding certification or referral by a physician or any other licensed professional. However, Section 908–3's benefits require **inpatient** care, which by definition requires admission to a hospital or similar facility and thus necessarily involves determinations by a licensed physician. *See* 40 P.S. §§ 908–1 and 908–3. Most relevantly, detoxification is statutorily defined as a process whereby an alcohol- or drug-dependent or intoxicated person is assisted, in a licensed facility, through the period of time necessary to eliminate the alcohol and/or drugs from the body "as determined by a licensed physician, while keeping the physiological risk to the patient at a minimum." 40 P.S. § 908–1. Thus, the statutory definition of detoxification expressly states that the inpatient detoxification process is to be "determined" by a licensed physician.[6] Conspicuously absent from Section 908–3, as well as from Sections 908–4 and 908–5, is any provision granting to managed care plans the authority to conduct an additional or overriding review via the application of utilization review for medical necessity and appropriateness.

If we were to accept the Federation's position in the instant case, we would effectively assign the General Assembly's judgments, as they are manifested in Act 106, to a subservient

---

6. We must respectfully disagree with the dissent's statement that under Act 106 "a patient may self-refer to detoxification." Dissenting Opinion at 57, 970 A.2d at 1130. Detoxification under § 908–3 is an **inpatient** procedure, which by definition necessitates **admission** for treatment to a hospital or similar facility. No provision in Act 106 suggests that an insured has been granted the authority to self-admit.

position relative to the judgments of managed care plans. We discern no indication in either Act 106 or Act 68 that the General Assembly intended such a result. Indeed, it is difficult to imagine how Act 106's statutory mandates could remain mandates in practice if the Federation's view of the Act were to prevail. There is simply no legal basis for the Federation's position that a managed care plan may decline to provide alcohol or drug abuse treatment, as mandated by Act 106, under the guise of utilization review for medical necessity and appropriateness of a licensed physician's or psychologist's certification and referral.

Accordingly, based on the text of Act 106, we hold that the Commonwealth Court and the Department did not err in concluding that the intent of the General Assembly was to require group health insurers to provide mandatory coverage for drug and alcohol abuse treatment once an insured has received a certification and a referral for treatment from a licensed physician or licensed psychologist. Furthermore, we hold that managed care plans may not abrogate or alter the licensed professional's certification and referral via the practice of utilization review for medical necessity and appropriateness.

We must note that in enacting Act 106 the General Assembly chose language that is very similar to several other mandated-benefit statutes, *e.g.*, statutes that require health insurance policies and contracts to provide coverage for annual gynecological examinations, mammograms, inpatient care for women who have just delivered a child, and childhood immunizations. The statutory language conferring each of these benefits is reproduced below:

For annual gynecological examinations:

A health insurance policy . . . **shall provide that the health insurance benefits applicable under the policy include coverage** for periodic health maintenance to include:

(1) Annual gynecological examination, including a pelvic examination and clinical breast examination.

(2) Routine pap smears in accordance with the recommendations of the American College of Obstetricians and Gynecologists.

40 P.S. § 1574 (emphasis added).[7]

For mammograms:

All group or individual health ... insurance policies ... and all group or individual subscriber contracts or certificates ... **shall also provide coverage** for mammographic examinations. The **minimum coverage required shall include all costs** associated with a mammogram every year for women 40 years of age or older and with any mammogram based on a physician's recommendation for women under 40 years of age.

40 P.S. § 764c (emphasis added).[8]

For inpatient care for new mothers:

Every health insurance policy that provides maternity benefits ... **shall provide coverage** for a minimum of 48 hours of inpatient care following normal vaginal delivery and 96 hours of inpatient care following Caesarean delivery.

40 P.S. § 1583(a) (emphasis added).[9]

For childhood immunizations:

any health insurance policy ... **shall provide that the health insurance benefits applicable under the policy include coverage** for child immunizations.

7. Section 4 of the Women's Preventive Health Services Act, Act of April 22, 1994, P.L. 136, 40 P.S. § 1571–77.

8. Section 632 of the Insurance Company Law of 1921, Act of May 17, 1921, P.L. 682, added by Section 4 of the Act of July 7, 1989, P.L. 755, as amended by Section 1 of the Act of Dec. 15, 1992, P.L. 1129.

9. Section 3 of the Health Security Act, Act of July 2, 1996, P.L. 514. This Section also provides as follows:

[A] health insurance policy may also provide for a shorter length of stay, but only if the treating or attending physician determines that the mother and newborn meet [specified] medical criteria for safe discharge....
40 P.S. § 1583(b).

40 P.S. § 3503.[10]

The language in the above provisions regarding gynecological examinations, mammograms, mothers' inpatient care, and childhood immunizations, is very similar to the portion of Act 106 that sets forth the requirement for coverage of drug and alcohol abuse and dependency benefits:

> All group health ... insurance policies ... and all group subscriber contracts ... **shall** ... **include within the coverage those benefits** for alcohol or other drug abuse and dependency as provided in sections [–3, –4, and –5].

40 P.S. § 908–2.

In each of the five provisions reproduced immediately above, the General Assembly determined that it was in the public interest that health insurance policies throughout the Commonwealth be required to cover the specified benefits. We discern no indication that the General Assembly intended to confer upon managed care plans the authority to second-guess its legislative judgment via the application of utilization review for the medical necessity and appropriateness of annual gynecological examinations or mammograms, inpatient care for new mothers, childhood immunizations [11]—or drug and alcohol abuse and dependency treatment.

**10.** Section 3 of the Childhood Immunization Insurance Act, Act of May 21, 1992, P.L. 239.

**11.** The dissent points out that these other mandated-benefit statutes set forth required coverage for preventative measures that follow a typical regimen and are available to a whole class of persons, in contrast to drug and alcohol treatment, "which is specific to individual patients and has aspects that are substantially remedial." Dissenting Opinion at 53, 970 A.2d at 1127–28. We do not dispute this characterization. However, we must respectfully disagree with the inference that such characterization somehow negates the significance of the similarities between the text of these statutes and the text of Act 106, § 908–2. We see no indication that the General Assembly drew a distinction between preventative versus remedial treatment measures. Furthermore, although, as the dissent suggests, persons can certainly be divided into classes based on gender, age, or new motherhood, individuals who engage in "a pattern of pathological use" of drugs or alcohol may also be considered to constitute a class. 40 P.S. § 908–1 (definition of alcohol or drug abuse);

Finally, we cannot fully understand the distinction that the dissent infers between 40 P.S. § 764c, which mandates coverage for mammo-

Although the Federation does not address the statutes mandating annual gynecological examinations or mammograms, inpatient care for new mothers, or childhood immunizations, the Federation **does** concede that there is at least one mandated-benefit statute in which the General Assembly has precluded managed care plans from conducting utilization review for medical necessity and appropriateness of the mandated benefits. *See* Federation's Brief at 27 (discussing 40 P.S. § 764d). This statute provides for inpatient and home health care following a mastectomy, as follows:

§ **764d. Mastectomy and breast cancer reconstruction**

(a)(1) No health insurance policy ... shall require outpatient care following a mastectomy performed in a health care facility.

(2) Policies described in clause (1) of this subsection shall provide coverage for inpatient care following a mastectomy for the length of stay **that the treating physician determines is necessary** to meet generally accepted criteria for safe discharge.

(3) Such policies shall also provide coverage for a home health care visit **that the treating physician determines is necessary** within forty-eight hours after discharge when the

grams, and Act 106. Section 764c provides that the "minimum coverage required shall include all costs associated with a mammogram every year for women 40 years of age or older and with any mammogram **based on a physician's recommendation** for women under 40 years of age." 40 P.S. § 764c (emphasis added). The dissent concludes that, for women under 40, the phrase " 'based on a physician's recommendation' ... clearly foreclose[s] utilization review upon such a recommendation." Dissenting Opinion at 52 n. 4, 970 A.2d at 1127 n. 4. However, with regard to Act 106, §§ 908–4 and 908–5, the dissent concludes that the certification and referral steps set forth therein do not preclude utilization review before an insured may qualify to receive drug or alcohol treatment benefits.

In sum, we are unconvinced by the dissent's attempts to distinguish Act 106 from other mandated-benefit statutes. Accordingly, if this Court were to hold that the physician's or psychologist's certification and referral under Act 106 were subject to utilization review for medical necessity and appropriateness prior to the provision of the mandated benefits, then we can see no principled reason why other statutorily mandated benefits, as discussed in the text, would not likewise be subject to utilization review. We cannot conclude that the statutory text chosen by the General Assembly is consistent with such a result.

discharge occurs within forty-eight hours following admission for the mastectomy.

40 P.S. § 764d(a) (emphasis added).[12]

Based on the clear text of Section 764d(a), the Federation acknowledges—as it must—that inpatient care and home health care following a mastectomy are benefits that must be covered as "the treating physician determines is necessary." 40 P.S. § 764d(a)(2) and (3). Thus, at least in the case of Section 764d(a), the Federation concedes that the General Assembly has precluded the application of utilization review for medical necessity and appropriateness, because the statutory text expressly places the responsibility to determine what post-mastectomy care is necessary exclusively with the treating physician.[13]

The Federation attempts to distinguish Section 764d(a) from Act 106 by asserting that the latter does not expressly place the authority to make a determination of medical necessity for the benefits at issue exclusively with the certifying and referring physician or psychologist, and thus does not preclude utilization review for medical necessity and appropriateness. We cannot agree. Although Act 106 does not use the exact language of Section 764d(a), Act 106 does indeed specify with whom the authority lies for establishing the need for treatment for drug and alcohol abuse/dependency. As we have

12. Section 633 of the Insurance Company Law of 1921, Act of May 17, 1921, P.L. 682, added by Section 3 of the Act of Nov. 4, 1997, P.L. 492.

13. The dissent agrees that Section 764d(a) forecloses utilization review. *See* Dissenting Opinion at 52, 970 A.2d at 1128. However, the dissent also argues that because Act 106 was not included in the list of enactments and programs to which Act 68 did not apply, *see* 40 P.S. § 991.2192, then the reach of Act 68 must extend to Act 106 and utilization review must be permitted in connection with the mandated benefits of Act 106. *See* Dissenting Opinion at 50–51, 970 A.2d at 1126. In our view, this argument is severely weakened by the recognition that neither Section 764d(a), nor Section 764c, both of which the dissent concludes foreclose utilization review, is included in the list of enactments and programs to which Act 68 does not apply. In fact, none of the statutes mandating certain health-care benefits is included in the list of enactments and programs to which Act 68 does not apply. Rather, the enumerated exceptions to Act 68 involve alternative financing programs, specifically workers' compensation, financial responsibility

discussed *supra*, for an insured to obtain non-hospital residential or outpatient drug or alcohol services under Act 106, a licensed physician or licensed psychologist must certify that the insured is suffering from drug or alcohol abuse or dependency and refer him or her for appropriate treatment. In the case of inpatient detoxification, the process is to be determined by a physician. *See* 40 P.S. §§ 908–1, 908–4, and 908–5. That the specific language of Act 106 differs from that of Section 764d(a) is not determinative.

In sum, with regard to the Federation's first issue, we conclude that under Act 106, a managed care plan may not employ utilization review for medical necessity and appropriateness to abrogate or alter the statutory prerequisites of certification and referral by a licensed physician or licensed psychologist. We hold that the sole prerequisite before an insured can obtain non-hospital residential or outpatient coverage under Act 106 is certification and referral from a licensed physician or licensed psychologist; similarly, the need for inpatient detoxification treatment is to be determined solely by a licensed physician.[14]

In the second issue raised for our review, the Federation contends that it is contrary to the public interest in ensuring cost-effective health care to preclude the application of utilization review for medical necessity and appropriateness in the context of Act 106's certification and referral provisions. We are mindful that questions of public policy rest in the first instance with the General Assembly. *See Program Administration Services, Inc. v. Dauphin County General Authority*, 593 Pa. 184, 928 A.2d 1013, 1017–18 (2007) (reiterating that "it is the Legislature's chief function to set public policy and the courts' role to enforce that policy, subject to constitutional limitations"). Furthermore, we have resolved the question of

under the Motor Vehicle Code, and fee-for-service programs under the Social Security Act.

14. The Department acknowledges that the Notice incorrectly suggested that a licensed psychologist could certify and refer an insured for inpatient detoxification under Section 908–3. The Department recognizes that a determination for inpatient detoxification can only be made by a licensed physician, not a psychologist. *See* Department's Brief at 12.

the General Assembly's intent with regard to Act 106 based on the plain language of the statute; accordingly, it would be improper to stray into the arena of public policy in resolving this case, and we decline to do so.[15] *See* 1 Pa.C.S. § 1921(c).

 In the third issue presented for our review, the Federation contends that the Commonwealth Court erred by affording deference to the Department's interpretation of Act 106. We are aware that while "an interpretation of a statute by those charged with its administration and enforcement is entitled to deference, such consideration most appropriately pertains to circumstances in which the provision is not explicit or is ambiguous." *Tritt, supra* at 905 (internal citation omitted). As discussed supra, we have resolved this case based on the plain text of the statute, not based on deference to the Department. Therefore, to the extent that the Commonwealth Court may have extended improper deference to the Department's interpretation, any such error is harmless.

**15.** Although we have not considered public policy in resolving the instant case, we can not fail to note that the Federation's public interest argument is based entirely on very general policy considerations underlying managed care as a mechanism for controlling the cost of health care. These very general policy considerations surrounding managed care need not constrict the choices of the General Assembly when it seeks to address concerns with regard to the availability or delivery of **specific** health care services. As we have discussed, the General Assembly has chosen to legislate on the delivery of several specific health care services, *e.g.*, annual gynecological examinations, mammography, inpatient care for new mothers, childhood immunizations, and treatment for drug and alcohol abuse. *See* text *supra*. In these cases, the General Assembly's judgment was properly informed by the individual characteristics and cost-benefit analyses of the specific medical examination, test, or treatment under consideration.

Briefs from *amici* illustrate the complex and factual nature of any cost-benefit analysis of drug and alcohol abuse treatment, involving not just the cost of providing treatment, but also issues of cost-shifting from private to public funds, drug-related criminal behavior, and other social costs of drug or alcohol abuse and dependency. It was for the General Assembly to balance the cost of requiring insurers to provide drug and alcohol abuse treatment against the potential benefits of doing so. That the General Assembly was aware of treatment costs and intended to limit them is clear from the fact that each portion of Act 106 contains strict limits on the mandated number of days of care or treatment sessions. Our role is distinctly *not* to second-guess the policy choices of the General Assembly.

█ In the fourth and final issue presented for our review, the Federation contends that the Department's Notice as to Act 106 should have been promulgated as a regulation rather than as a statement of policy.

█ We have previously explained that "[s]tatements of policy are agency pronouncements that declare [the agency's] future intentions but which are applied prospectively on a case-by-case basis and *without* binding effect." *Borough of Pottstown v. Pennsylvania Municipal Retirement Board,* 551 Pa. 605, 712 A.2d 741, 743 n. 8 (1998) (emphasis in original). As the Commonwealth Court has previously pointed out, a statement of policy is "one that tracks a statute and does not expand upon its plain meaning." *Eastwood Nursing and Rehabilitation Center v. Department of Public Welfare,* 910 A.2d 134, 142 (Pa.Cmwlth.2006) (citation and emphasis omitted). We have quoted the Court of Appeals for the District of Columbia to explain the utility of a statement of policy:

As an informational device, the general statement of policy serves several beneficial functions. By providing a formal method by which an agency can express its views, the general statement of policy encourages public dissemination of the agency's policies prior to their actual application in particular situations. Thus the agency's initial views do not remain secret but are disclosed well in advance of their actual application. Additionally, the publication of a general statement of policy facilitates long range planning within the regulated industry and promotes uniformity in areas of [ ] concern.

*Pennsylvania Human Relations Commission v. Norristown Area School District,* 473 Pa. 334, 374 A.2d 671, 676 n. 17 (1977) (quoting *Pacific Gas & Electric Co. v. Federal Power Commission,* 506 F.2d 33, 38 (D.C.Cir.1974)).

Also in *Pennsylvania Human Relations Commission,* we distinguished a statement of policy from a regulation thusly:

An administrative agency has available two methods for formulating policy that will have the force of law. An agency may establish binding policy through rulemaking

procedures by which it promulgates substantive rules, or through adjudications which constitute binding precedents. A general statement of policy is the outcome of neither a rulemaking nor an adjudication; it is neither a rule nor a precedent but is merely an announcement to the public of the policy which the agency hopes to implement in future rulemakings or adjudications. A general statement of policy, like a press release, presages an upcoming rulemaking or announces the course which the agency intends to follow in future adjudications.

The critical distinction between a substantive rule and a general statement of policy is the different practical effect that these two types of pronouncements have in subsequent administrative proceedings. A properly adopted substantive rule establishes a standard of conduct which has the force of law. The underlying policy embodied in the rule is not generally subject to challenge before the agency.

A general statement of policy, on the other hand, does not establish a **"binding norm"**. A policy statement announces the agency's tentative intentions for the future. When the agency applies the policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued.

*Pennsylvania Human Relations Commission, supra* at 679 (quoting *Pacific Gas & Electric, supra* at 41 (emphasis added)); *see also Home Builders Association of Chester and Delaware Counties v. Department of Environmental Protection,* 828 A.2d 446, 450–51 (Pa.Cmwlth.2003), *affirmed,* 577 Pa. 274, 844 A.2d 1227 (2004) (same).[16]

---

**16.** The statutory definitions of a statement of policy and a regulation are as follows:

> **"Regulation"** means any rule or regulation, or order in the nature of a rule or regulation, promulgated by an agency under statutory authority in the administration of any statute administered by or relating to the agency, or prescribing the practice or procedure before such agency.

45 P.S. § 1102(12).

> **"Statement of policy"** means any document, except an adjudication or a regulation, promulgated by an agency which sets forth substantive or procedural personal or property rights, privileges, immunities,

■ Finally, we note that "an agency may revise its policies and amend its regulations in interpreting its statutory mandates." *Elite Industries, Inc. v. Pennsylvania Public Utility Commission,* 574 Pa. 476, 832 A.2d 428, 431–32 (2003)

Based on all of the above principles, we have no difficulty concluding that the Department did not err in issuing the Notice as a statement of policy. A straightforward reading of the plain language of the Notice demonstrates that it was meant to advise and to provide guidance as to the legal obligations of those entities subject to Act 106. No additional or more specific duties under Act 106 were placed on any entity by the Notice. Through publication of the Notice, the Department merely announced the policy that it planned to apply in the future, based on the plain text of Act 106. The Department did not abuse its discretion in choosing to follow such a course, and the Federation's fourth and final issue is entirely meritless.

In sum, having concluded that none of the Federation's issues has any merit, we affirm the Commonwealth Court's order granting the Department's motion for judgment on the pleadings.

Order affirmed.

Justices EAKIN and BAER join the opinion.

Justice TODD files a concurring opinion.

Justice SAYLOR files a dissenting opinion in which Chief Justice CASTILLE joins.

duties, liabilities or obligations of the public or any part thereof, and includes, without limiting the generality of the foregoing, any document interpreting or implementing any act of Assembly enforced or administered by such agency.
45 P.S. § 1102(13).
With regard to the above statutory definitions, the Commonwealth Court has pointed out that a statement of policy is defined by what it is, while a regulation is defined by how it is issued. *Home Builders Association, supra* at 450.

48

Justice TODD, concurring.

I agree with the sound conclusion expressed by the Plurality in the Opinion Announcing the Judgment of the Court ("OAJC") that managed care plans may not apply utilization review for the drug and alcohol abuse benefits at issue in this case, and I would likewise affirm the order of the Commonwealth Court. However, I write separately as I do not agree with the analysis relied upon by the Plurality to reach that result in several respects. Thus, with one exception,[1] I concur only in the result of the OAJC.

Contrary to the Plurality's analysis, and largely for the same reasons expressed by Justice Saylor in his Dissenting Opinion, I find Act 106 to be ambiguous with respect to the legislature's intention concerning the application of utilization review to these benefits. See Dissenting Opinion at 50–53, 970 A.2d at 1126–28. It is for this reason that I cannot join the Plurality's plain meaning analysis.

In this regard, I am not persuaded by the Plurality's reliance, in its textual analysis of Act 106, on the similarity of the language of Act 106 to the language found in other benefits statutes. See Opinion Announcing the Judgment of the Court at 38–42, 970 A.2d at 1119–21 (discussing 40 P.S. § 1574 (gynecological exams); 40 P.S. § 764c (mammograms); 40 P.S. § 1583 (post partum care); 40 P.S. § 3503 (childhood immunizations); 40 P.S. § 764d (mastectomies)). This reliance is problematic because, as the Dissent notes, the language in these statutes is "materially distinct" from Act 106, Dissenting Opinion at 52, 970 A.2d at 1127, and, in my view, is substantially clearer in its manifestation of legislative intent.

I disagree also with the Plurality's reliance on these statutes as I cannot accept its characterization that they are, in fact, "other mandated-benefit statutes" which foreclose utilization review. See, e.g., Opinion Announcing the Judgment of the Court at 38–39, 970 A.2d at 1119. The Plurality contends

1. I join the OAJC with respect to its analysis rejecting the Federation's contention that the Department's notice should have been promulgated as a regulation. See Opinion Announcing the Judgment of the Court at 45–47, 970 A.2d at 1123–24.

these statutes are examples of such mandated-benefit statutes without citation to authority or independent analysis.[2] The latter omission is understandable, as we have not been asked to construe the mandatory nature of the language in these statutes. Yet, in its attempt to discern the meaning of Act 106, the Plurality seemingly construes these five other statutes as well, and then uses its construction of those statutes to support its construction of Act 106. Absent authority or analysis for the conclusion that these other statutes manifest benefits mandated by the Legislature and foreclose utilization review—questions that are not before us—these statutes' putative linguistic similarity to Act 106 is immaterial.

Finding Act 106 to be ambiguous, I turn to our deferential standard of review of administrative decisions. As the Plurality aptly notes, where a statute is ambiguous, its interpretation "by those charged with its administration and enforcement is entitled to deference." *Tritt v. Cortes,* 578 Pa. 317, 321, 851 A.2d 903, 905 (2004). We "will not disturb administrative discretion in interpreting legislation within an agency's own sphere of expertise absent fraud, bad faith, abuse of discretion, or clearly arbitrary action." *Winslow–Quattlebaum v. Maryland Ins. Group,* 561 Pa. 629, 636, 752 A.2d 878, 881 (2000); *see also Com., Office of Admin. v. Pennsylvania Labor Relations Bd.,* 591 Pa. 176, 190 n. 11, 916 A.2d 541, 549 n. 11 (2007) (according "substantial deference" to such interpretations).

Despite the valid concerns expressed in the Dissenting Opinion with regard to the Department's failure to fully explicate its change of position, *see* Dissenting Opinion at 55–57, 970 A.2d at 1129–30, I cannot find the Department's

**2.** The Plurality's analogy to 40 P.S. § 764d (mastectomies) is arguably the least troublesome because, as the Plurality notes, the Federation concedes that this statute forecloses utilization review. Nevertheless, I am uncomfortable with the Plurality opining on the meaning of a statute that is not before us, *see* Opinion Announcing the Judgment of the Court at 42, 970 A.2d at 1121 ("[A]t least in the case of Section 764d(a), the Federation concedes that the General Assembly has precluded the application of utilization review for medical necessity and appropriateness...."), and then using that interpretation to guide our interpretation of the statute at issue.

interpretation of Act 106 to be the result of fraud, bad faith, an abuse of discretion, or clearly arbitrary action. Accordingly, I would defer to its interpretation, and affirm the Commonwealth Court on that basis.[3]

Justice SAYLOR, dissenting.

I respectfully dissent. Initially, I agree with the Insurance Federation's core position that Act 106, on its face, does not foreclose utilization review. In this regard, I do not believe that the Legislature's decision to mandate coverage in the abstract, see 40 P.S. § 908-2 (requiring that certain insurance policies "include within the coverage [certain] benefits for alcohol or other drug abuse and dependence"), equates to an express prohibition against implementing the required benefits within the terms of the insurer's pre-existing business model. Indeed, having enacted legislation to encourage managed care practices as a method by which quality health care can be provided on a cost-effective basis,[1] it does not seem likely that the General Assembly would have acted to foreclose such review relative to particular benefits without some form of express indication. Moreover, when the General Assembly expressly accepted utilization review within consumer-protection legislation as a staple of the cost-containment objective of

3. The Federation contends we should decline to defer to the Department's interpretation of Act 106 because that position was developed in the context of litigation. Brief for the Insurance Federation of Pennsylvania, Inc. at 40 (quoting *ARIPPA v. Pennsylvania Pub. Util. Comm'n,* 792 A.2d 636, 660 (Pa.Cmwlth.2002) (*en banc*) ("Normally, no deference is given when an agency interprets a statute to justify its position in litigation, as in a brief filed in court.")). While this Court has discussed the potential problems with deferring to administrative interpretations made in the context of litigation, we have yet to adopt such an exception to our general rule of administrative deference. *See Seeton v. Pennsylvania Game Comm'n,* 594 Pa. 563, 578 & n. 12, 937 A.2d 1028, 1037 & n. 12 (2007) (opining on the potential "dangers of deferring to interpretations developed in anticipation of litigation," but not adopting such an exception). Regardless, I find no indication that the notice in this case—published prior to the declaratory judgment action herein—was issued by the Department in the context of litigation.

1. Act of December 29, 1972, P.L. 1701, No. 364 (as amended, 40 P.S. §§ 1551–1568).

managed care in Act 68,[2] it specifically barred Act 68 from applying within the framework of an enumerated list of existing enactments and programs, but omitted Act 106 from that list. *See* 40 P.S. § 991.2192. Indeed, Act 68 contemplates that under some circumstances "a licensed psychologist may perform a utilization review for behavioral health care services," 40 P.S. § 991.2152(d), including treatment for drug and alcohol abuse. *See* Opinion Announcing the Judgment of the Court, at 34, 970 A.2d at 1116 (observing that the Department does not challenge the Federation's contention that, in the health care industry, behavioral health subsumes drug and alcohol dependency).

Although the lead opinion purports to rely on the plain terms of the statute in discerning an express indication to foreclose utilization review within the framework of Act 106 benefits, *see* Opinion Announcing the Judgment of the Court, at 43–44, 970 A.2d at 1122, I believe that its rationale, in fact, is more substantially premised on inference from the statutory language. In this regard, I differ with the lead opinion's position that because Act 106 imposes certification and referral prerequisites to obtaining care, it necessarily prohibits any other prerequisites—or, for that matter, any concurrent or retrospective review process. More centrally, I differ with the lead opinion's position that Act 106's terms imposing a requirement of certification and referral upon an *insured* ("Before an insured may qualify to receive benefits under this section, a licensed physician or licensed psychologist must certify the insured as a person suffering from alcohol or drug abuse dependency and refer the insured for appropriate treatment," 40 P.S. §§ 908–4, 908–5), amounts to an express prohibition against utilization review of medical necessity and appropriateness on behalf of the *insurer*. *See* Opinion Announcing the Judgment of the Court, at 35–37, 970 A.2d at 1117–18. Rather, facially, the statute indicates only that a patient cannot self-refer for such services. Furthermore, as the Insurance Federation stresses, the above-quoted provision does not contain terms in any way similar to the Depart-

2. Act of June 17, 1998, P.L. 464, No. 68 (as amended 40 P.S. §§ 991.2101–991.2194).

ment's 2003 notice declaring that "the only lawful prerequisite before an insured obtains nonhospital residential and outpatient coverage [and inpatient detoxification] for alcohol and drug dependency treatment is a certification and referral from a licensed physician or licensed psychologist," and "[t]he certification and referral in all instances controls both the nature and duration of the treatment." I also disagree with the suggestion that, merely because the definition of detoxification indicates that the process is to be administered by a licensed physician, the Legislature intended managed care organizations to abandon their business model and accept the unconstrained determination of any physician. *See* Opinion Announcing the Judgment of the Court, at 36, 970 A.2d at 1118.[3]

To bolster its position that Act 106 expressly forecloses the application of the core managed-care practice of utilization review, the lead opinion references a series of other mandatory-benefits statutes. *See* Opinion Announcing the Judgment of the Court, at 36–44, 970 A.2d at 1118–22. Each of these, however, is materially distinct from Act 106. As to the requirements to provide benefits associated with annual gynecological examinations and mammograms, these preventative measures generally apply with respect to an entire class of individuals (women) and on a specific time table (*i.e.*, annually). 40 P.S. §§ 764c, 1574.[4] Childhood immunizations are also

---

3. Indeed, the Department concedes that Act 106 allows for the employment of at least some managed care practices, including the requirement to use in-network providers. *See* Brief for the Department at 14.

4. With regard to mammograms for women under the age of forty, the mandate for coverage is specifically based on "a physician's recommendation," 40 P.S. § 764c, also clearly foreclosing utilization review upon such a recommendation.

 Responsively, the lead opinion stresses its finding of a parallel between Section 764c's requirement of mammogram coverage for women under forty "based on a physician's recommendation," 40 P.S. § 764c, and Section 908-4's prescription that "[b]efore an insured may qualify to receive benefits under this section, a licensed physician or licensed psychologist must certify the insured as a person suffering from alcohol or other drug abuse or dependence and refer the insured for the appropriate treatment." 40 P.S. § 908-4. *See* Opinion Announcing the Judgment of the Court Opinion, at 40 n. 11, 970 A.2d at 1120 n. 11. The lead opinion's reasoning, however, fails to account for the very different phrasing of the two statutes, with the former specifying mandatory coverage "based on" a specific condition, and the latter being phrased as a condition precedent, without any particular indication of exclusivity.

class-wide, preventative measures following a typical regimen, unlike drug and alcohol treatment, which is specific to individual patients and has aspects that are substantially remedial. The operation of the statute requiring coverage for inpatient care for new mothers is, again, a class-wide measure based upon an indisputable event, the delivery of a child. *See* 40 P.S. § 1583(a). Finally, the statute requiring the provision of insurance coverage for inpatient care related to mastectomies and breast cancer reconstruction specifically designates that length of stay is determined by the "treating physician," 40 P.S. § 764d(a)(2, 3), thus expressly foreclosing utilization review. I agree with the Insurance Federation that the language contained in this statute demonstrates that the Legislature knows how to place the judgment as to medical necessity and duration of treatment expressly and exclusively within the hands of a treating physician. Therefore, I believe the General Assembly's failure to do so across the provisions of Act 106 supports the Federation's position that it did not manifest an intention to displace utilization review.

While I differ with the lead opinion's position that the plain language of Act 106 is conclusive, it does seem to me that there is sufficient uncertainty to warrant reference to principles of statutory construction, permitting consideration of, *inter alia,* the occasion and necessity of the statute; the object to be attained; the consequences of a particular interpretation; the contemporaneous legislative history; and administrative interpretations of the statute. *See* 1 Pa.C.S. § 1921(c). The legislative history of Act 106 reflects the concern of legislators with the treatment of those suffering from alcohol- and drug-related addictions, as well as the alleviation of attendant social problems. However, it also reflects regard for cost control and the burden imposed on insurance companies. *See, e.g.,* Pa. Leg. Journal—House 1945–50 (November 29, 1989). Notably, there is no indication in the statute or in the legislative history that the Legislature designed for insurance companies to fund treatment that is not medically necessary or appropriate. Accordingly, to the degree that managed care organizations maintain appropriate criteria for medical

necessity and appropriateness, I do not regard the application of utilization review as fundamentally inconsistent with Act 106. Furthermore, as the Insurance Federation develops in its reply brief, the Legislature has otherwise imposed checks on utilization review designed to facilitate fairness, accuracy, and accountability in the utilization review process.[5]

Running throughout the Department's brief, and to some degree incorporated into the lead opinion, is a suggestion of distrust of managed care organizations and the utilization review process in terms of the willingness to make fair and valid determinations concerning medical necessity and appropriateness, as well as a lack of confidence in the existing checks to ensure such fairness and validity.[6] This apparent

5. The Quality Health Care Accountability and Protection Act requires managed care plans to "[a]dopt and maintain a definition of medical necessity used by the plan in determining health care services," 40 P.S. § 991.2111(3), and provide to each enrollee a written "summary of the plan's utilization review policies and procedures," id., § 991.2136(a)(7). Further, the statute provides for the certification of utilization review organizations and operational guidelines for those organizations, id., §§ 991.2151–2152, and for mandatory internal and external grievance procedures for utilization review determinations of medical necessity and appropriateness, with an ultimate right of review by a court of competent jurisdiction. Id., §§ 991.2161–2163.

6. See Brief for the Department at 19 (indicating that utilization review may be used to "override the prescription of a licensed medical professional" made on the basis of medical necessity); id. at 14 ("The Appellant Federation is trying to turn a mandated benefit into a discretionary benefit."); id. at 16 ("Under the Appellant Federation's 'theory' of statutory construction, managed care organizations could override the judgment of the General Assembly and 'manage' Act 106 benefits out of existence."); id. at 17 ("It would be a gross distortion of the meaning of Act 68 to read this statute to grant complete discretion to managed care organizations to override benefits mandated by the General Assembly for the protection of consumers."); id. at 21 ("Managed care plans and utilization review entities do not have the discretion to ignore the General Assembly's public policy choice in the delivery of Act 106 substance abuse benefits under the guise of utilization review for medical necessity."); id. at 22 ("Managed care organizations should not be permitted to abrogate a mandated benefit under the guise of 'medical necessity.' "); id. at 23 ("As the Appellant Federation would have it, the General Assembly granted unbridled discretion to managed care organizations to second-guess the judgment of certifying and referring medical professionals, leaving both access to and delivery of substance abuse benefits in doubt."); cf. Opinion Announcing the Judgment of the Court, at 36, 970 A.2d at 1118 (reflecting the concern

mistrust, at least in its present degree, seems to be a relatively recent development, as it appears that the Insurance Department acceded in the provision of Act 106 benefits within the terms of the managed care business model for fourteen years after passage of the act, until the issuance of its 2003 notice. *See, e.g.,* April 5, 1993 Department Notification, R.R. at 108a–109a (reflecting a Department notice in the context of Act 106 benefits indicating, *inter alia,* that "[i]t is now possible for the Department of Insurance to approve products of licensed health insurers that have pre-certification as part of the process for determining appropriateness of treatment," and that the "Department will accept filings which use managed care techniques in the treatment of substance abuse," subject to enumerated standards).[7] Were there similar misgivings manifested on the face of Act 106, I would join the lead opinion in foreclosing utilization review.

It may be that, in practice, the existing checks on utilization review have proven to be insufficient to ensure the conferral of benefits consistent with legislative intent. However, no such record has been presented to this Court. Moreover, if the mandatory benefits are truly being subverted, the Department has an available and appropriate remedy, in that it is authorized to promulgate substantive rules and regulations it deems necessary for the effective implementation of Act 106. *See* 40 P.S. § 908–7. The formal process for the promulgation of such rules and regulations affords notice and an opportunity on the part of those affected to be heard, as well as the

that an interpretation of Act 106 permitting utilization review "would have the potential to weaken if not effectively eliminate the mandatory language of Act 106").

7. The Department does not specifically deny that it previously acceded to the affordance of 106 benefits via the managed care overlay. Rather, it merely indicates that the 1993 memorandum issued by a former Deputy Insurance Commissioner on the agency's behalf "hardly amounts to an official interpretation of Act 106," and explains that its "legal interpretation of Act 106 has continued to develop over time." Brief for the Department at 31 & n. 14.

If Act 106 were as clear as the Department now contends, and as the lead opinion now holds, the Department's apparent prior acquiescence would have represented an abdication of its charge to execute the laws of the Commonwealth in relation to insurance. *See* 40 P.S. § 41.

assurance of regularity properly attaching to major policy milestones. *See* 45 P.S. §§ 1201–1208; 71 P.S. §§ 745.1– 745.14. In this regard, it seems to me that the Department's repeated expression of concerns with inappropriate adminis- tration of insurance benefits at the whims of insurance compa- nies are matched by the Insurance Federation's concern with informal, wholesale alterations of policy on the impulse of state agencies. *See, e.g.,* Brief of Appellant at 47 ("So what are insurers to do, knowing that when the mood hits it a state agency can issue a 'notice' and dramatically change the law overnight?").

Lastly, I recognize that the interpretation of an administra- tive agency warrants the Court's consideration in statutory construction, and certainly a fair degree of deference is due to the interpretation of an agency charged with the enforcement of a statute. Here, however, I might accord more deference to the Department's interpretation if it would provide greater context concerning its prior interpretation of Act 106 and/or support for its repeated implications that managed care organ- izations abuse utilization review with regard to Act 106 bene- fits when permitted to apply it.[8] Moreover, the Department's 2003 notice contains several mistakes and inconsistencies, which I believe further diminish the degree of deference due the notice and the associated reversal of policy. For example, the Department now recognizes that the notice's specification for referral to detoxification by a licensed psychologist finds

8. Additionally, the United States Supreme Court has explained that the ordinary deference to which an agency is entitled is lessened where, as here, its interpretation is contained in a notice developed without the benefit of public commentary. *See Christensen v. Harris County,* 529 U.S. 576, 587, 120 S.Ct. 1655, 1662, 146 L.Ed.2d 621 (2000); *see also Reno v. Koray,* 515 U.S. 50, 61, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995) (internal agency guideline, which is not "subject to the rigors of the Administrative Procedur[e] Act, including public notice and comment," entitled only to "some deference" (internal quotation marks omitted)); *accord ARIPPA v. Pennsylvania PUC,* 792 A.2d 636, 660 (Pa.Cmwlth. 2002); Brief for Appellant at 40 ("State agencies, like federal agencies, can be empowered with the authority to interpret the laws they enforce through two vehicles—(1) adjudications; and (2) regulations. Both processes involve formal procedures that seek to ensure a fair and impartial interpretation of the statute at issue, as explained by the [*Christensen*] Court.").

no basis in the statutory text. *See* Brief for the Department at 12. Moreover, the statutory provisions mandating benefits for detoxification contain no requirement for certification or referral at all. Thus, under the act's plain terms, and contrary to the Department's notice, a patient may self-refer to detoxification and retain eligibility for mandatory benefits upon admission.[9] Additionally, the Department presently retreats substantially from the notice's indication that "[t]he certification and referral in all instances controls both the nature and duration of the treatment," explaining that there may be later coordination between the referring professional and treating professionals as to the nature and duration of treatment. *See* Brief for the Department at 23.[10]

In summary, I believe that Act 106 is ambiguous in terms of the Legislature's intent relative to the implementation of managed care practices, and, applying principles of statutory construction, I support the approach that such practices are not legislatively foreclosed. Rather, I believe that, particularly at this juncture, further restrictions on the application of managed care practices should derive from the General As-

9. The lead opinion takes issue with the concept of self-referral relative to inpatient procedures. *See* Opinion Announcing the Judgment of the Court, at 37 n. 6, 970 A.2d at 1118 n. 6 ("Detoxification under § 908-3 is an **inpatient** procedure, which by definition necessitates **admission** for treatment to a hospital or similar facility. No provision in Act 106 suggests that an insured has been granted the authority to self-admit." (emphasis in original)). Unlike the lead opinion, however, I read the statutory references to physician referral, *see* 40 P.S. §§ 908-4, 908-5, as distinct from admission to an inpatient treatment program, *see id.,* § 908-3(c). Even if they were not distinct in the abstract, the Notice's provision for certification and referral by any licensed psychologist or physician does not appear identical to the lead opinion's conception of admission to treatment by a doctor at the hospital in question.

10. The lead opinion concludes that a certification and referral prerequisite is implied, because detoxification treatment requires inpatient care, "which by definition requires admission to a hospital or similar facility and thus necessarily involves determinations by a licensed physician." Opinion Announcing the Judgment of the Court, at 37, 970 A.2d at 1118. As manifested in other portions of Act 106, however, the Legislature clearly knew how to impose a certification and referral requirement in plain terms. *See* 40 P.S. §§ 908-4, 908-5. The legislative acknowledgement, within a definitional provision, that the detoxifica-

58

sembly or, at a minimum, be tested via the established proce-
dures for promulgation of substantive rules and regulations.

Chief Justice CASTILLE joins this dissenting opinion.

tion process is subject to a doctor's oversight in no way approaches
such a specification.