8 A.3d 282

CASH AMERICA NET OF NEVADA, LLC, Appellant

v.

COMMONWEALTH of Pennsylvania, DEPARTMENT OF BANKING, and the Honorable Steven Kaplan, in his official capacity as Secretary of Banking of the Commonwealth of Pennsylvania, Appellees.

Supreme Court of Pennsylvania.

Argued May 11, 2010.

Decided Oct. 19, 2010.

434

Alan S. Kaplinsky, Esq., Raymond Adam Quaglia, Esq., Jeremy Rosenblum, Esq., David Pittinsky, Esq., Ballard

Spahr Andrews & Ingersoll, L.L.P., Philadelphia, for Cash America Net of Nevada, LLC.

Jeffrey S. Saltz, Esq., Law Office of Jeffrey S. Saltz, P.C., Philadelphia, for amici curiae, J.R. Clark, G. Michael Flores, Marc A. Fusaro.

Carter David Frantz, Esq., Robert Christopher Lopez, Esq., PA Department of Banking, for Department of Banking.

Robert L. Byer, Esq., Pittsburgh, Robert McCarthy Palumbos, Esq., Jennifer Diesing Falcey, Esq., Duane Morris, L.L.P., Philadelphia, for Dept. of Banking & Steven Kaplan.

Steven Kaplan, for Steven Kaplan.

Kerry Elizabeth Smith, Esq., Community Legal Services, Aisha Ahmed Baruni, Esq., for amicus curiae Community Legal Services, Inc.

Daniel P. Mosteller for amicus curiae Daniel P. Mosteller.

Irwin William Aronson, Esq., Willig, Williams & Davidson, Harrisburg, for amicus curiae Pennsylvania AFL–CIO.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## *OPINION*

Justice BAER.

The issues before us involve the authority of the Department of Banking (Department) to apply Section 3.A of the Consumer Discount Company Act,[1] 7 P.S. § 6203.A, to lenders without offices or personnel in Pennsylvania. Based on the plain language of the statute, we hold that Section 3.A makes it unlawful for any unlicensed lender to make the specified types of loans in this Commonwealth, regardless of whether the lender is physically located or has personnel in the Commonwealth. We therefore affirm the Commonwealth Court.

1. Act of April 8, 1937, P.L. 262, as amended, 7 P.S. §§ 6201–6219 (the CDCA).

Appellant Cash America Net of Nevada, LLC (Cash America), is a Delaware limited liability company qualified to do business in Nevada and licensed by the Nevada Division of Financial Institutions, with no offices or employees in Pennsylvania, engaged in the business of making short-term "payday" loans to Pennsylvania residents over the Internet. Payday lending is a consumer lending practice in which a lender offers consumers high-rate, short-term loans secured by either a post-dated check or a debit authorization from a bank. These post-dated checks or debit authorizations become payable to the lender at the end of the loan term, usually set at two weeks to coincide with the borrower's payday. *Pa. Dep't of Banking v. NCAS of Del., LLC,* 596 Pa. 638, 948 A.2d 752, 754 (2008). The Department characterizes such loans as a predatory lending practice.

Cash America's Pennsylvania borrowers constitute one of its critical market segments. Indeed, Cash America earned approximately $10 million annually by making payday loans over the Internet to Pennsylvania residents in amounts of the lesser of 25% of the borrower's gross monthly income or $750. Cash America assesses a finance charge of 25% of the amount borrowed. The annual percentage rate (APR) of the loans offered by Cash America are as follows: for an eight day term, 1140.63%; for a fourteen day term, 651.79%; for a thirty-five day term, 260.71%. Cash America has not obtained a license from the Department for its lending to Pennsylvania residents. If Cash America were licensed, it would not be permitted under Pennsylvania law to charge residents such high interest rates.

The powers and responsibilities of the variety of lenders present in the marketplace are defined in a sophisticated statutory scheme. We are concerned here only with a nondepository, nonmortgage, consumer lender of amounts less than $25,000. Such lenders are regulated by the Loan Interest and Protection Law (LIPL), 41 P.S. §§ 101–605, and the CDCA, 7 P.S. §§ 6201–6219. Accordingly, our discussion of lenders encompasses only those lenders within the reach of the LIPL and the CDCA. Read together, the LIPL and the CDCA

limit the amount of interest lenders may charge on loans under $25,000.

Specifically, Section 201 of the LIPL generally caps interest rates on loans less than $50,000 at 6% as follows:

Except as provided in Article III of this act, the maximum lawful rate of interest for the loan or use of money in an amount of fifty thousand dollars ($50,000) or less in all cases where no express contract shall have been made for a less rate shall be six per cent per annum.

41 P.S. § 201(a).

The CDCA, which was originally enacted in 1937, defines "person" as including "an individual, partnership, association, business corporation, nonprofit corporation, common law trust, joint-stock company or any other group of individuals however organized." 7 P.S. § 6202. Section 3.A of the CDCA, 7 P.S. § 6203.A, bars "persons" from making loans under $25,000 and charging in excess of the lawful interest rate, unless that person is licensed in accord with the act:

[N]o person shall engage . . . in this Commonwealth, either as principal, employe, agent or broker, in the business of negotiating or making loans or advances of money on credit, in the amount or value of twenty-five thousand dollars ($25,000) or less, and charge, collect, contract for or receive interest. . . . or other considerations which aggregate in excess of the interest that the lender would otherwise be permitted by law to charge if not licensed under this act . . . except a domestic business corporation organized under or existing by virtue of the Business Corporation Law of this Commonwealth, after first obtaining a license from the Secretary of Banking of the Commonwealth of Pennsylvania in accordance with the provisions of this act.

7 P.S. § 6203.A. A person licensed pursuant to the CDCA is authorized to make loans of $25,000 or less under the rates, terms, and conditions contained in the CDCA, which can be up to approximately 24%. 7 P.S. § 6213.E and 6217.1.A.

Within the context of this case, the effect of these two statutes is that if a lender is licensed by the Department in

accord with the CDCA, it can charge between 6–24% on loans under $25,000. If it is not licensed, it is bound by the 6% cap imposed by the LIPL. The issue presented herein is how Cash America, which is not licensed under the CDCA and does not wish to be licensed, fits into this scheme. Cash America argues that it is exempt because it operates outside without personnel in Pennsylvania.

The Secretary of Banking (Secretary) and the Department had, until recently, agreed with Cash America. Until July 26, 2008, the Department did not impose the LIPL's general 6% interest rate or the CDCA to out-of-state lenders. Before then, the Department had interpreted the phrase "in this Commonwealth" in Section 3.A of the CDCA not to apply to entities without any offices or employees physically present in the Commonwealth, such as Cash America. Under the prior interpretation, articulated in a series of interpretive letters, such an entity would not be required to obtain a license under the CDCA to originate consumer loans by means of the Internet or mail to residents of the Commonwealth with charges exceeding 6% simple interest per annum, provided that the entity was licensed or otherwise authorized under its home state law to engage in this type of lending activity. With the rise of Internet-based lending activity, however, it became clear to the Department that its prior position had "resulted in Pennsylvania consumers being exposed to the very lending practices that the CDCA was enacted to protect them from," *i.e.*, lending at high interest rates by non-licensed entities. 38 Pa. Bull. 3986, 3987 (July 26, 2008). The Department determined that its prior interpretation of "in this Commonwealth" within Section 3.A of the CDCA was not compelled as a matter of statutory interpretation or legislative intent. Consequently, the Department revised its interpretation of Section 3.A of the CDCA.

On July 26, 2008, the Department published this policy change in the Pennsylvania Bulletin in a "Notice to those Engaging or Considering Engaging in Nonmortgage Consumer Lending to Pennsylvania Residents," 38 Pa.Bull. 3986 (July 26, 2008) (Notice), indicating its intent to provide Pennsylvania

consumers with the protections of the CDCA, regardless of whether the lender or its employees are located in Pennsylvania. The Department announced "that engaging in nonmortgage consumer lending to Pennsylvania residents by any means, including by means of the internet or by mail, constitutes engaging in such business 'in this Commonwealth' as contemplated by Section 3.A of the [CDCA]." *Id.*

Under this interpretation, the Department would require licensing under the CDCA for entities engaged in consumer lending to Pennsylvania residents in amounts below $25,000 in which the charges exceed 6% simple interest per annum. The Notice further provided that a person licensed under the CDCA is permitted to negotiate or make loans to Pennsylvania residents under the rates, terms and conditions contained in the CDCA. *Id.* Finally, the Notice advised that entities engaged in consumer lending to Pennsylvania residents in which the charges exceed 6% simple interest per annum (such as Cash America) must be licensed under the CDCA by February 1, 2009, or cease lending to Pennsylvania residents. *Id.* at 3987.

According to Cash America, payday lending is not economically viable under the interest rate restrictions of the CDCA. Cash America therefore decided to forego either limiting its interest rate to the 6% imposed by the LIPL or attempting to obtain a license in accord with the CDCA. Instead, it filed a petition for review in the nature of a complaint in equity against the Department and the Secretary (Appellees) in the Commonwealth Court on January 8, 2009, seeking declaratory and injunctive relief. It sought to have the Notice declared unlawful and to enjoin Appellees from implementing or enforcing it. It averred that it is a limited liability company existing under the laws of Delaware and qualified to do business in Nevada; it has no personnel or office physically located in Pennsylvania; and licensure under the CDCA was not possible for Cash America because Pennsylvania law requires that a licensed lender be a Pennsylvania business corporation. *See* 7 P.S. § 6203.A; 7 P.S. § 6207 ("A license under the provisions of this act shall be issued only to a corporation organized

under the Business Corporation Law of the Commonwealth of Pennsylvania.").

In its petition, Cash America requested a declaration that an out-of-state company without an office or employee physically present in Pennsylvania acting as "principal, employe, agent or broker" (collectively referred to here as "personnel") is not engaged in business "in this Commonwealth" as the phrase is used in Section 3.A; that, accordingly, implementation and enforcement of the Notice violated the plain language of the CDCA; and that, for these reasons, the Department should be enjoined from applying the Notice to out-of-state lenders without personnel in Pennsylvania. Additionally, Cash America sought a declaration that the implementation and enforcement of the Notice constituted unpromulgated rulemaking in violation of Pennsylvania law, entitling Cash America to an injunction against enforcement until the Department complied with requirements for promulgating a new regulation. Finally, Cash America requested a declaration that implementation of the Notice would render the CDCA inconsistent with the Commerce Clause of the United States Constitution and therefore unconstitutional.[2]

The Department filed an answer and a counterclaim for declaratory judgment. It denied that licensure was not an option for Cash America and explained in a new matter that the Department interprets the laws of the Commonwealth to allow it to grant licensure to lenders regardless of whether they are a Pennsylvania business corporation with its principal place of business in Pennsylvania, as long as the lender is a company qualified to do business in Pennsylvania and has a registered agent in the Commonwealth. In its counterclaim, the Department asserted that because Cash America was not

2. Cash America withdrew its request for relief under the Commerce Clause. This argument was based on the Department's application of the CDCA to out-of-state lenders with no personnel or office in Pennsylvania in conjunction with its position, set forth in an interpretive letter, that a CDCA licensee must maintain its principal place of business in Pennsylvania. The Department rescinded the latter position by interpretive letter, which the parties agree effectively mooted Cash America's Commerce Clause argument.

licensed under the CDCA, it was prohibited from charging interest and fees that aggregate in excess of 6%, pursuant to Section 201 of the LIPL, 41 P.S. § 201, and that its lending practices violated both the LIPL and the CDCA. The Department requested a declaration that Cash America's Internet lending to Pennsylvania residents is not authorized by Pennsylvania law because it violates the CDCA and the LIPL. The parties filed cross-motions for summary judgment.[3]

The Commonwealth Court resolved the parties' arguments in a published decision. *Cash America Net of Nev., LLC v. Dep't of Banking,* 978 A.2d 1028 (Pa.Cmwlth.2009). Substantively, the Commonwealth Court rejected Cash America's argument that Section 3.A of the CDCA clearly and unambiguously excluded from its purview an out-of-state lender with no personnel or office in Pennsylvania. The Commonwealth Court agreed with the Department that despite its previous interpretation of Section 3.A to exclude out-of-state lenders, its current interpretation to include them was correct based on the statutory language. Additionally, the court found that the Department's interpretation was consistent with legislative intent. Accordingly, the Commonwealth Court concluded that there were no material facts in dispute and the Department's right to judgment was clear, thus entitling it to summary relief. The Court declared that Cash America's practice of making pay day loans to Pennsylvania residents is not authorized by the laws of the Commonwealth and that such lending specifically violates the LIPL and the CDCA.

Addressing Cash America's argument that the Notice was an invalid regulation because it was not adopted pursuant to the Commonwealth Documents Law (Documents Law), 45 P.S. §§ 1102–1602, the Commonwealth Court agreed with the Department that the Notice was not a regulation. Like the previous interpretations of Section 3.A of the CDCA, which were not binding on courts and did not have the force of law,

3. Following a preliminary injunction hearing, counsel for all parties agreed that Cash America's request for a preliminary injunction and the Department's implementation of its new policy would be stayed pending disposition by the Commonwealth Court *en banc* of cross-motions for summary judgment.

the Commonwealth Court reasoned that the Department adopted the Notice in a manner consistent with its authority to enforce the CDCA through interpretive letters and did not claim that its new interpretation was binding on courts or even on the Department. *Cash America*, 978 A.2d at 1034 (citing Section 202.D of the Department of Banking Code, 71 P.S. § 733–202.D, which permits the Department to "issue statements of policy and interpretive letters necessary and appropriate to administer this act or any other statute within the department's jurisdiction to administer or enforce."); *see Ins. Fed'n of Pa., Inc. v. Ins. Dep't*, 929 A.2d 1243 (Pa.Cmwlth. 2007) (holding that agency notice was a statement of policy that interpreted existing law), aff'd 601 Pa. 20, 970 A.2d 1108 (2009).

Judge Leavitt authored a dissent, joined by Judges Cohn Jubelirer and Simpson. The dissent noted that since the enactment of the CDCA in 1937 the Department understood Section 3.A to require a lender to have personnel physically present in the Commonwealth before the Department could license that lender. According to the dissent, the Department could not reinterpret Section 3.A to effect a new regime of regulation because its new interpretation was not supported by the plain language of the statute or legislative intent. The dissent concluded that it is irrelevant that Cash America is making loans via the Internet. What is relevant, in the dissent's view, is that the CDCA does not and was never intended to apply to interstate transactions.

On appeal, Cash America asks this Court to consider whether the Department's new policy determination as to the applicability of Section 3.A of the CDCA to Internet payday lenders is supported by the statutory language; whether an out-of-state lender with no principal, employee, agent, broker or office in Pennsylvania is subject to the LIPL, 41 P.S. § 201; whether the Department's announcement of its new policy established a binding norm that must be promulgated as a regulation; whether the Commonwealth Court properly declared Cash America to be in violation of the CDCA in the context of a declaratory judgment action; and whether our

decision, if we affirm·the Commonwealth Court, should apply only prospectively.

 Because this claim raises an issue of statutory construction, which is a question of law, this Court's standard of review is de novo and the scope of review is plenary. *Malt Beverages Distribs. Ass'n v. Pa. Liquor Control Bd.*, 601 Pa. 449, 974 A.2d 1144, 1149 (2009); *Generette v. Donegal Mut. Ins. Co.*, 598 Pa. 505, 957 A.2d 1180, 1189 (2008); *Commonwealth v. Shiffler*, 583 Pa. 478, 879 A.2d 185, 189 (2005). In resolving the issues presented, we are guided by the settled principles set forth in the Statutory Construction Act, including the primary maxim that the object of statutory construction is to ascertain and effectuate legislative intent. 1 Pa.C.S. § 1921(a). In pursuing that end, we are mindful that "when the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b). As a general rule, therefore, the best indication of legislative intent is the plain language of a statute. *Malt Beverages*, 974 A.2d at 1149; *Shiffler*, 879 A.2d at 189. Reading the plain statutory language, "words and phrases shall be construed according to rules of grammar and according to their common and approved usage," while any words or phrases that have acquired a "peculiar and appropriate meaning" must be construed according to that meaning. 1 Pa.C.S. § 1903(a). It is only when "the words of the statute are not explicit" on the point at issue that resort to statutory construction is appropriate. 1 Pa.C.S. § 1921(c); *Malt Beverages*, 974 A.2d at 1149. Finally, in ascertaining legislative intent, the Statutory Construction Act requires a presumption that the General Assembly did not intend a result that is absurd or unreasonable. 1 Pa.C.S. § 1922(1).

## I. CDCA

 According to Cash America's interpretation of Section 3.A of the CDCA, if a lender does not have personnel in Pennsylvania, it is not "in this Commonwealth" as that phrase is used in Section 3.A. Cash America asserts that interpret-

ing the phrase "either as principal, employe, agent or broker" as modifying the immediately preceding phrase "in this Commonwealth" effectively limits the reach of the CDCA to solely intrastate loan transactions. In contrast, according to Cash America, interpreting the phrase "either as principal, employe, agent or broker" as modifying the word "person," as the Commonwealth Court majority did, renders the phrase entirely meaningless. Moreover, Cash America observes that if the General Assembly intended to extend the CDCA to lenders without a physical presence in Pennsylvania, it knew how to accomplish this result, as it has demonstrated in other, unrelated statutes. *See, e.g.*, the Pennsylvania Goods and Services Installment Sales Act, 69 P.S. § 1103 (applying the act to offers or agreements made in Pennsylvania to Pennsylvania buyers, "regardless of the situs of the contract as specified therein").

Moving beyond the plain language of the CDCA, Cash America argues that the General Assembly did not intend to regulate interstate transactions. It asserts that the CDCA was enacted at a time when the General Assembly could not constitutionally reach out-of-state lenders without a physical presence in this Commonwealth. *See Crutcher v. Kentucky*, 141 U.S. 47, 11 S.Ct. 851, 35 L.Ed. 649 (1891) (invalidating a Kentucky statute that purported to require out-of-state companies to obtain a license before doing business in Kentucky and holding that "a state law is unconstitutional and void which requires a party to take out a license for carrying on interstate commerce"). Given this jurisprudence, Cash America maintains that the General Assembly properly limited the scope of the CDCA to intrastate commerce. *See* 1 Pa.C.S. § 1922(3) ("the General Assembly does not intend to violate the Constitution of the United States."). Although Cash America acknowledges that Commerce Clause jurisprudence has evolved since 1937 to permit the General Assembly to require licensure of lenders located outside of the state, it asserts that this evolving jurisprudence is not relevant to our consideration of the General Assembly's intent in 1937. *See Commonwealth v. Bavusa*, 574 Pa. 620, 832 A.2d 1042, 1051

(2003) (rejecting a dynamic view of statutory interpretation that would measure legislative intent in light of constitutional authority which was non-existent at the time the General Assembly acted). Thus, according to Cash America, because the General Assembly could not have subjected out-of-state lenders to the requirements of the CDCA in 1937, the Department cannot now interpret the CDCA to require such licensure.

Moreover, Cash America argues that interpreting the CDCA to apply to out-of-state lenders raises Commerce Clause issues with regard to the CDCA's requirements that a licensee be a domestic business corporation, 7 P.S. § 6203.A, and maintain an office or principal place of business in Pennsylvania, 7 P.S. § 6208. Although the Department has, by interpretive letter, declared that it will interpret the CDCA not to require an out-of-state licensee to maintain an office or principal place of business in Pennsylvania, Cash America asserts that this strained interpretation is a tacit admission by the Department that it cannot constitutionally harmonize all provisions of the CDCA.

Additionally, according to Cash America, the absence of any legislative action to revise the Department's long-standing prior interpretation of the CDCA is a tacit recognition that the prior interpretation is in accord with legislative intent. *See Gilligan v. Pa. Horse Racing Comm'n*, 492 Pa. 92, 422 A.2d 487 (1980) (finding that the legislature's acquiescence to the manner of the commission's exercise of its rule-making authority manifested approval thereof); *Estate of Loeb*, 400 Pa. 368, 162 A.2d 207, 211 (1960) ("Where . . . the words of a statute are not clear or explicit the contemporaneous construction of a statute by those charged with its execution and application, especially when it has long prevailed, is entitled to great weight and should not be disregarded or overturned except for clear language in the [Pennsylvania Transfer Inheritance Tax Act] itself or very strong cogent and convincing reasons."). Significantly, according to Cash America, the legislature has amended Section 3 of the CDCA seven times since its adoption and has left undisturbed the words newly interpreted by the

Department, thereby, in Cash America's view, endorsing the Department's original interpretation.

In that the Department has reversed its prior, longstanding interpretation of Section 3.A, Cash America argues that it is not entitled to the deference normally afforded to agencies because of their specialized experience. Cash America posits that when an agency has changed its position with regard to the interpretation of a statute, it is never entitled to deference regarding its new interpretation. *See RAG Cumberland Res. v. Dep't of Envtl. Prot.*, 869 A.2d 1065, 1072 n. 11 (Pa.Cmwlth. 2005) ("Any deference we owe to the Department in this case must yield to Petitioners' considerable evidence that the Department's 'new' statutory interpretation is an abrupt *volte face* from the interpretation it had followed for more than thirty years."). Rather, Cash America submits that when an agency has abided by a particular longstanding interpretation of statutory language, only the legislature can alter that interpretation by amending and changing the relevant statutory language. According to Cash America, this Court has cautioned against an agency ushering in a new regulatory scheme that is directly contrary to its longstanding prior regulatory position without authorizing legislation. *See Malt Beverages,* 601 Pa. 449, 974 A.2d 1144, 1154 (2009) ("While a policy determination [regarding the expanded definition of 'retail dispenser' offered by the Board] may well be accomplished by our legislature, it is not our role to sanction such a momentous transformation.").

The Department likewise offers alternative arguments based on the text of the CDCA and the Act's legislative history. The Department argues that the rules of grammar support the Commonwealth Court's construction of Section 3.A. Specifically, the Department argues that a plain reading of Section 3.A reveals that it is unlawful for any unlicensed person to engage in the Commonwealth in the business of making loans of $25,000 or less and charge interest and fees that exceed the 6% interest cap imposed by the LIPL, and Section 3.A includes those who may not engage in the Commonwealth in the proscribed lending practice to include per-

sonnel, specifically, a "principal, employe, agent, or broker." The Department asserts that by explaining that a person cannot lawfully operate under the CDCA as a principal, employee, agent or broker, the statute specifies that it is applicable to more than simply a principal. According to this argument, the fact that the phrase "either as principal, employe, agent or broker" is set off by commas indicates that it is nonrestrictive in nature, *i.e.*, it contains non-essential information and can be removed without changing the sentence's basic meaning.

The Department also points to Sections 3.B and 11 of the CDCA, which each define when a person is engaged in business covered by the Act. 7 P.S. § 6203.B (providing that a person "shall be deemed to be engaged in the business contemplated by this act" where that person either "hold[s] himself out as willing or able to arrange for or negotiate" loans of $25,000 or less for which interest and other consideration aggregates in excess of 6% annual simple interest or "solicits prospective borrowers of such loans."); 7 P.S. § 6211 ("[a] person, who is not licensed under this act, shall be presumed to be engaged in business contemplated by this act if he advertises or solicits business as principal, agent or broker for which a license is required by the provisions of this act."). According to the Department, Cash America's lending to Pennsylvania residents falls within the scope of these provisions.

Looking beyond the CDCA's plain language, the Department examines the act's remedial purpose, legislative history, and its own experience and expertise to support its position. Specifically, the Department argues that the remedial purpose of the CDCA is to protect Pennsylvanians from extortionist interest rates, *see Equitable Credit & Disc. Co. v. Geier*, 342 Pa. 445, 21 A.2d 53, 57 (1941), and that the General Assembly drafted the CDCA broadly to regulate the activity of negotiating or making loans on which the total charges exceed 6% annual simple interest. According to the Department, interpreting the CDCA as Cash America advocates to regulate instate lenders while turning a blind eye to the most exploitative

out-of-state lenders would frustrate the broad regulatory objective of the CDCA. As a remedial statute, according to the Department, the CDCA should be construed against the lender. *See* 1 Pa.C.S. § 1928(c) (providing that "provisions of a statute shall be liberally construed to effect their objects and to promote justice"). Additionally, the Department argues that the CDCA is framed in general terms and may be adapted to new lending practices, such as Internet lending, as they arise.

The Department argues that the CDCA's legislative history supports the regulation of an out-of-state lender such as Cash America that holds itself out to Pennsylvania residents as able to arrange loans governed by the CDCA. Specifically, the 1937 Report of the Secretary of Banking (1937 Report) that became the basis for the CDCA discussed the hazards of solicitations from lenders by newspaper advertisements, which the Department analogizes to Internet solicitations. Moreover, the Department argues it is not clear, as Cash America would have it, that the Commerce Clause as interpreted when the CDCA was originally enacted would have prohibited the General Assembly from requiring licensure of out-of-state lenders. Besides, according to the Department, the interpretation of the Commerce Clause in 1937 does not dictate the meaning of the CDCA today.

The Department also responds to Cash America's argument that the CDCA only applies to in-state lenders because it requires a licensee to be a domestic business corporation, *see* 7 P.S. § 6203.A, and maintain its principal place of business in Pennsylvania, *see* 7 P.S. § 6208. The Department argues that it does not enforce either of these requirements in a manner violative of the Commerce Clause. According to the Department, it interprets the requirement that a licensee be a domestic business corporation in a manner that avoids a conflict with the Commerce Clause by granting licenses to both domestic and foreign business corporations and limited liability companies. Similarly, "it is the position of the Department that [a foreign entity] is not required to maintain a principal place of business or any other physical location in

Pennsylvania in order to become licensed under the CDCA."
R.R. 184a (Interpretive letter of the Department dated December 18, 2008); Department's brief at 43.

The Department disputes Cash America's reliance on the Department's prior interpretation of Section 3.A as evidence of legislative intent not to apply the CDCA to out-of-state lenders because, according to the Department, nothing prevents it from reconsidering and revising its prior interpretations. It further disputes Cash America's position that the Department has initiated through the Notice a "momentous transformation" in policy that can only be accomplished by the legislature. *See Malt Beverages,* 974 A.2d at 1154. According to the Department, *Malt Beverages* did not alter the ability of an agency to revise its own non-binding interpretations of a statute.

It is well established that public policy in this Commonwealth prohibits usurious lending, and this prohibition has been recognized for over 100 years. *NCAS of Del.,* 948 A.2d at 759. As explained above, the maximum lawful rate of interest that a lender may charge for the loan or use of money in the amount of $50,000 or less is six percent per year. Section 201 of the LIPL, 41 P.S. § 201. The CDCA provides an exception to this general rule by allowing entities to charge a borrower more for consumer loans up to $25,000, provided that the lender acquires a license under the CDCA. *See* Section 3(A) of the CDCA, 7 P.S. § 6203(A). Specifically, Section 3.A directs that an unlicensed entity cannot loan money at rates "in excess of the interest that the lender would otherwise be permitted by law to charge if not licensed...."

Here, Cash America's loans are less that $25,000, and include charges from 260.71% for a thirty-five day loan to 1140.63% for an eight day loan. Cash America argues, however, that notwithstanding its business of making loans in amounts less than $25,000 to Pennsylvania residents, it is not subject to these regulations because it has no personnel in Pennsylvania. Essentially, it argues that by remaining physically outside of Pennsylvania, there is no limit on the interest it can charge to Pennsylvania residents, and that it may

operate at an advantage to in-state lenders by charging far more than the CDCA permits licensed, in-state lenders to charge. As explained below, we reject this argument on the basis of the plain language of Section 3.A of the CDCA.

The CDCA regulates nonmortgage consumer lending in two related ways. First, it requires any "person" who engages "in this Commonwealth, either as principal, employe, agent or broker" in the business of negotiating or making loans in the amount of $25,000 or less and charges interest and fees that aggregate in excess of 6% annual simple interest to obtain a license from the Secretary. 7 P.S. § 6203.A. The act defines "person" as including "an individual, partnership, association, business corporation, nonprofit corporation, common law trust, joint-stock company or any other group of individuals however organized." 7 P.S. § 6202. Second, if the lender is "a domestic business corporation organized under or existing by virtue of the Business Corporation Law of this Commonwealth," and it is licensed, then the CDCA provides that it may charge interest and fees that aggregate in excess of 6% annual interest, 7 P.S. §§ 6213.E and 6217.1.A, in exchange for submitting to a regulatory scheme that includes examinations by the Department, minimum capital requirements, and other caps on interest rates and fees. See 7 P.S. §§ 6207, 6211, 6213, and 6217.1.

A plain reading of Section 6203.A indicates that those persons, whether an individual or group of organized individuals, who may not engage in the proscribed lending activity in this Commonwealth includes not only the principal, but also the employee, agent, or broker of the principal. The CDCA thus regulates not only the conduct of the individual or corporation, but also the people who act on behalf of the individual or corporation. If a corporation or any representative is engaging in the business of making the qualified loans in this Commonwealth, it or they must abide by the licensure requirements of the CDCA.

Contrary to Cash America's interpretation of Section 3.A, in which a lender is not in this Commonwealth if it does not have a "principal, employe, agent or broker" in Pennsylvania, the

quoted phrase is set off by a pair of commas within the statutory provision, indicating that the phrase is nonrestrictive.[4] This nonrestrictive phrase does not restrict the meaning of "in this Commonwealth" and, in fact, could be removed from the sentence without changing the sentence's basic meaning. The nonrestrictive phrase modifies the preceding word "person." By defining "person" broadly to include individuals and legal entities, and providing that a "person" can act through its personnel, the CDCA regulates lending activity regardless of who is acting on behalf of the lender.[5]

Examining the plain language of Section 3.A, we hold that it supports the Department's and the Commonwealth Court's interpretation. We therefore reject Cash America's attempt to avoid licensure, regulation, and limits on the rates it may charge simply by operating over the Internet rather than by being physically present in the Commonwealth. If an out-of-state lender is engaging in business in Pennsylvania of making loans within the ambit of the CDCA, then it is subject to the licensing requirements and regulatory restrictions of the CDCA, regardless of whether it has personnel in the state.

This conclusion is further supported by Sections 3.B and 11 of the CDCA, 7 P.S. §§ 6203.B and 6211. These sections describe when a lender is "engaged in the business contemplated by" the CDCA. They are focused on how lenders represents themselves and whether they purposefully direct

---

**4.** Nonrestrictive clauses are parenthetic and therefore are separated by commas. William Strunk, Jr. and E.B. White, *The Elements of Style* (4th ed.2000), at 4. A nonrestrictive clause adds, parenthetically, a supplement to the main clause. *Id.*

**5.** Cash America relies on the Statutory Construction Act to argue that we cannot rely on the placement of commas because the CDCA was originally enacted in 1937. *See* 1 Pa.C.S. § 1923(b) ("In no case shall the punctuation of a statute control or affect the intention of the General Assembly in the enactment thereof but punctuation may be used to aid in the construction thereof if the statute was finally enacted after December 31, 1964."). Section 3.A has, however, been amended five times since December 31, 1964. *See* Act of Dec. 30, 1970, P.L. 959, No. 301, § 2; Act of March 3, 1976, P.L. 36, No. 17, § 1; Act of Dec. 18, 1984, P.L. 1083, No. 216, § 2; Act of Dec. 12, 1994, P.L. 1060, No. 144, § 1; Act of July 12, 1996, P.L. 490, No. 80, § 1. Because the current version of Section 3.A was finally enacted after December 31, 1964, we may consider its punctuation.

their activities to conduct encompassed by the CDCA, regardless of the lender's location. *See* Section 3.B, 7 P.S. § 6203.B ("Any person who shall hold himself out as willing or able to arrange for or negotiate such loans ... or who solicits prospective borrowers of such loans ... shall be deemed to be engaged in the business contemplated by this act ..."); Section 11, 7 P.S. § 6211 ("A person, who is not licensed under this act, shall be presumed to be engaged in business contemplated by this act if he advertises or solicits business as principal, agent or broker for which a license is required by the provisions of this act ...").

We also reject Cash America's argument that the Department's current interpretation of Section 3.A fails to give constitutional effect to all of the CDCA's provisions. Specifically, Section 8 requires the licensee to maintain its business records "at its principal place of business within this Commonwealth...." 7 P.S. § 6208. Additionally, Section 3.A provides that any person making the qualified loans must (1) be "a domestic business corporation organized under or existing by virtue of the Business Corporation Law of this Commonwealth" and (2) "[obtain] a license from the [Secretary] in accordance with the provisions of [the CDCA]."

As the Department acknowledges, if it were to require a foreign lender seeking a CDCA license to establish its principal place of business in Pennsylvania, it may unconstitutionally burden interstate commerce in violation of the Commerce Clause. The Department interprets Section 8, 7 P.S. § 6208, to avoid this potentiality by not requiring a foreign entity to maintain its principal place of business, or any physical location, in Pennsylvania, in order to be licensed. *See* R.R. 184.a (Interpretive Letter of December 18, 2008).

Moreover, the text of Section 3.A requires licensees to be "a domestic business corporation organized under or existing by virtue of the Business Corporation Law." 7 P.S. § 6203.A. The Business Corporation Law provides for the domestication of foreign corporations and grants them all the powers, privileges, duties, and limitations granted and imposed on domestic business corporations. 15 Pa.C.S. § 4161. A foreign corpora-

tion may become domesticated in accord with the Business Corporation Law by filing articles of domestication with the Department of State, and would, therefore be entitled to apply for a license in accord with the CDCA. Cash America has not attempted to become so licensed pursuant to the CDCA because it does not aspire to operate in Pennsylvania by the same rules that apply to Pennsylvania corporations or foreign domesticated corporations. Pennsylvania lenders cannot make loans at the rates Cash America has charged. Nor is Cash America arguing that it is being shut out of Pennsylvania and is unable to obtain a license to do business in the state. As *amici* explain,[6] Cash America wants the benefits of doing business with Pennsylvania residents while evading the regulations. Instead of seeking equal treatment, Cash America is trying to bypass state usury laws and consumer protections by doing business in Pennsylvania without a license. *See NCAS of Del.*, 948 A.2d at 761, n. 11 ("usury is generally accompanied by subterfuge and circumvention of one kind or another to present the color of legality.").[7]

Regarding Cash America's reliance on the Department's prior interpretations of Section 3.A, these non-binding prior interpretations do not determine the statute's meaning. We are not bound by the Department's interpretations; we are bound by the plain language of the statute. Similarly, Cash America's argument that the General Assembly could have explicitly indicated its intention to apply the CDCA to interstate transactions if that was its intent, as demonstrated by explicit language in other, unrelated statutes, is not persuasive. We are interpreting the plain language of the CDCA,

6. Community Legal Services, the Pennsylvania AFL–CIO, and the Center for Responsible Lending filed an *amici* brief in support of the Department.

7. That Cash America is not interested in doing business in Pennsylvania on a level playing field with Pennsylvania corporations is born out by the record before us. For example, in its brief, it states that "payday lending is not economically viable under the interest rate restrictions imposed by the CDCA." Appellant's brief at 14. Additionally, it explained to the Commonwealth Court that the company will lose money if it makes loans that comply with the CDCA, and it would rather stop making loans in Pennsylvania than try to obtain a license. R.R. 196.

and this analysis is not influenced by language in irrelevant statutes.

We likewise agree with the Department that *Malt Beverages* does not restrict an administrative agency's prerogative to revise its own non-binding statements of policy. *Malt Beverages* concerned the Pennsylvania Liquor Control Board's (LCB) interpretation of the statutory definition of "retail dispenser" in the Liquor Code. 974 A.2d at 1154. The LCB asked this Court to interpret the Liquor Code to effect a substantial change in the law. In resolving the ambiguous language in the Liquor Code, we observed that accepting the LCB's interpretation would amount to a momentous transformation of policy that was contrary to the three-tiered beer distribution scheme established by the legislature. In contrast to the ambiguous language at issue in *Malt Beverages*, we specifically find the language of Section 3.A is not ambiguous. Our explanation in *Malt Beverages* was dependent on our finding that the LCB's interpretation was actually contrary to legislative intent. More importantly, however, the Department may issue "statements of policy and interpretive letters" regarding the CDCA. 71 P.S. § 733–202.D. As we explain more fully in our discussion of the second issue, the Department issued the Notice under this explicit power. This Court, therefore, is not effecting a momentous transformation in the law, but is validating the Department's right to reinterpret the statute it is charged with enforcing in accord with the law.

Likewise, *Gilligan* and *Loeb* do not prevent the Department from revising prior interpretations. *Gilligan* involved a rule promulgated by a commission rather than a non-binding interpretation. 422 A.2d 487. The Court emphasized that after the commission affirmatively acted under the rule at issue and the legislature did not curtail the commission in this regard, it thereby acquiesced in the interpretation embodied in the rule. In *Loeb*, the executors of an estate computed an inheritance tax at 15% in accord with the interpretation of the Transfer Inheritance Tax Act, 72 P.S. § 2302, which had existed for 39 years. 400 Pa. 368, 162 A.2d 207. The Department of Reve-

nue computed and calculated the tax in accordance with a new Tax Calculation Directive to arrive at a different calculation. This Court examined the language of the Tax Act and rejected the Department of Revenue's new directive, finding that it conflicted with the "clear, simple, definite, and universal construction of the Act for 39 years by Judges and lawyers, as well as by the Commonwealth itself in ... thousands of cases, and is likewise in conflict with decisions of this Court which, by necessary implication, have held to the contrary...." *Id.* at 211. In contrast, the Department's prior interpretation of Section 3.A of the CDCA has never been applied by any court.

In conclusion, we hold that interpreting the CDCA in the manner advocated by Cash America would subject in-state lenders to regulation pursuant to the CDCA while simultaneously creating a *de facto* licensing exemption for out-of-state lenders, who could then engage in the very lending practices the CDCA prohibits. Such an interpretation is not supported by the plain language of Section 3.A, 7 P.S. § 6203.A.[8]

## II. Interpretation Versus Regulation

██ Cash America argues that the Department's new interpretation of Section 3.A as explained in the Notice was the

---

**8.** In a circular, nebulous argument, Cash America argues that, based on its interpretation of the CDCA, it is exempt it from licensing requirements and regulation because it is not located in Pennsylvania. Because of this purported exemption, according to Cash America, the LIPL's 6% simple interest cap, *see* 41 P.S. § 201, does not apply to it. In support of this argument, Cash America relies on Section 604 of the LIPL, which provides that the simple interest cap does not apply where it is inconsistent with the interest permitted by any other act, including the CDCA. 41 P.S. § 604. According to Cash America, therefore, it is entitled to originate consumer loans over the Internet to Pennsylvania residents with no limit on the maximum interest rate it may charge.

Cash America's interpretation of the LIPL is premised on its flawed interpretation of the CDCA. Therefore, for the same reasons that we reject Cash America's interpretation of the CDCA, we likewise reject this argument. Section 201 of the LIPL provides that the maximum interest rate that a lender may lawfully charge for a loan in the amount of $50,000 or less is 6% per year unless another Pennsylvania law, such as the CDCA, authorizes a higher interest rate. Because no Pennsylvania or federal law authorizes Cash America to charge Pennsylvania residents the rates of interest connected to its loans, it is violating the default maximum interest rate provided by the LIPL.

promulgation of a new regulation, as opposed to a statement of policy, and as a regulation, the Department was required to follow the prescribed process for promulgation. According to Cash America, the binding nature of the Department's new interpretation renders it a regulation.

According to the Department, the Notice was not an unpromulgated regulation, but a non-binding statement of policy that a court may accept or reject depending on the accuracy of its interpretation. It argues that it published the Notice under the specific power of the Department of Banking Code, 71 P.S. 733–202.D, which permits it to issue statements of policy and interpretive letters.

We have summarized the difference between regulations and policy statements as follows:

A properly adopted substantive rule establishes a standard of conduct which has the force of law ... The underlying policy embodied in the rule is not generally subject to challenge before the agency. A general statement of policy, on the other hand, does not establish a "binding norm." ... A policy statement announces the agency's tentative intentions for the future.

*Lopata v. UCBR,* 507 Pa. 570, 493 A.2d 657 (1985) (quoting *PHRC v. Norristown Area Sch. Dist.,* 473 Pa. 334, 374 A.2d 671, 679 (1977)). When an agency makes an interpretation of general applicability, that policy statement lacks the force of law of a properly adopted regulation. *Eighty–Four Mining. Co. v. Three Rivers Rehab., Inc.,* 554 Pa. 443, 721 A.2d 1061, 1066 (1998); *Norristown,* 374 A.2d at 679. A general statement of an agency's policy does not establish a binding norm upon that agency, but announces the agency's provisional intentions for the future. *Eighty–Four,* 721 A.2d at 1066. Reviewing courts have the discretion to accept or reject the agency's general statement of policy, depending on how accurately the interpretation reflects the meaning of a statute. *Id.* A properly adopted regulation, unlike a statement of policy, has the force of law and is binding on a reviewing court. *Norristown,* 374 A.2d at 679. Regulations must be promulgat-

ed in compliance with the Documents Law, 45 Pa.C.S. § 501 *et seq.*, which details notice and comment procedures.

The Department can act in one of two ways to interpret the CDCA. First, the CDCA authorizes the Secretary to issue binding "rules and regulations as may be necessary for the protection of the public, for insuring the proper conduct of the business contemplated by this act, and for the enforcement of this act, which ... shall have the force and effect of law." 7 P.S. § 6212. Additionally, Section 202.D of the Department of Banking Code authorizes the Department to issue "statements of policy and interpretive letters" regarding the CDCA, which do not have the force of law. 71 P.S. § 733–202.D.

Pursuant to its authority under Section 202.D of the Department of Banking Code, the Department issued the Notice interpreting Section 3.A of the CDCA. It did not invoke its authority under Section 12 to issue binding rules and regulations. The Department very clearly expressed that the Notice articulated its interpretation of the law. *See* Notice, 38 Pa. Bull. 3986 ("it is the position of the Department of Banking (Department) that engaging in nonmortgage consumer lending to Pennsylvania residents by any means, including by means of the internet or by mail, constitutes engaging in such business 'in this Commonwealth' as contemplated by section 3.A of the Consumer Discount Company Act ..."). This interpretation, like the prior interpretation, did not have the force and effect of law, and we see no reason to require the Department to reinterpret Section 3.A through a binding regulation.[9]

### III. Declaratory Judgment Action

▆ Cash America next argues that the relief ordered by the Commonwealth Court exceeds the bound of a declaratory judgment action. According to this argument, the courts must wait until the Department initiates an enforcement action against Cash America for violating the CDCA as interpreted

9. Indeed, Cash America agrees with the Department that the prior interpretation of Section 3.A, issued through interpretive letters, was not a binding norm. R.R. 209a.

in the Notice before the courts can rule on the merits of the Department's current interpretation of the CDCA; a declaratory judgment action is an improper vehicle for the Department to enforce the CDCA or the LIPL.

The Department observes that Cash America answered the Department's counterclaim without challenging the Commonwealth Court's authority under the Declaratory Judgment Act, 42 Pa.C.S. §§ 7531 *et seq.*, to grant the declaration the Department requested. Because Cash America did not argue in the Commonwealth Court that the court lacked the authority to grant the Department's declaration, the Department argues that Cash America has waived this argument. Additionally, according to the Department, it is authorized to maintain declaratory judgment actions pursuant to the Department of Banking Code, 71 P.S. § 733–503.C, and the Declaratory Judgment Act, 42 Pa.C.S. § 7541(b).

Cash America's argument fails for several reasons. First, because Cash America asked the Commonwealth Court for a declaration that it was not violating the CDCA, answered the Department's counter-claim, and moved for summary relief, it cannot now complain that the Commonwealth Court lacked authority to declare that it was violating the CDCA. Moreover, the Department is authorized to maintain actions for "an injunction or other process against any person to restrain and prevent the person from engaging in activity violating ... any [ ] statute or regulation within the department's jurisdiction to administer or enforce." 71 P.S. § 733.503–C. Additionally, there is no need for the Department to initiate a separate enforcement action to seek to establish that Cash America is violating the CDCA because the Declaratory Judgment Act provides the means to assert this fact. 42 Pa.C.S. § 7532 ("The declaration may be either affirmative or negative in form and effect, and such declarations shall have the force and effect of a final judgment or decree.")

### IV. Prospectivity

In the event this Court affirms the Commonwealth Court, Cash America argues that the ruling should apply

prospectively and that we should hold that Cash America did not violate Pennsylvania law before the publication of this Court's decision. According to the Department, Cash America is arguing for the first time on appeal that the Commonwealth Court's declaration that Cash America was operating in violation of the CDCA and this Court's affirmance of that order should not apply retroactively, and therefore this argument has been waived through Cash America's failure to raise it to the court below.

Cash America did not assert this argument before the Commonwealth Court, and may not raise it for the first time on appeal. *See* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). Moreover, the parties agreed that Cash America would stay its application for preliminary injunction, and the Department would forgo enforcing the CDCA and the LIPL against out-of-state lenders until the Commonwealth Court decided the parties' cross-applications for summary relief. In accord with the parties' explicit agreement, therefore, Cash America is not subject to any retroactive application of the Commonwealth Court order by the Department. Accordingly, we will not resolve the parties' arguments in this regard, both because it is waived and appears to be hypothetical.

Accordingly, the order of the Commonwealth Court is affirmed.

Chief Justice CASTILLE, and Justices EAKIN, TODD, McCAFFERY, ORIE MELVIN join the opinion.

Justice SAYLOR files a concurring opinion.

Justice SAYLOR, concurring.

I join the Court's holding and support much of the majority's reasoning. In light of the incongruities in the governing statute relative to foreign lenders and the interpretive history in the Department of Banking, however, I have difficulty with the majority position that the case can be resolved solely based on plain-meaning interpretation. Rather, I believe statutory construction is implicated, to include consideration of the

policy objectives of the statute, which I believe strongly support the present holding of the Court.